228 P.3d 813 (2010)
STATE of Washington, Respondent,
v.
Loni VENEGAS, Appellant.
No. 37828-1-II.
Court of Appeals of Washington, Division 2.
April 13, 2010.
*815 Casey Grannis, Nielsen Broman & Koch, PLLC, Seattle, WA, for Appellant.
Melody M. Crick, Pierce County Prosecuting Attorney, Tacoma, WA, for Respondent.
PENOYAR, A.C.J.
¶ 1 Loni Venegas appeals her convictions of first degree assault of a child (count I) and two counts of second degree assault of a child (counts II and III) for assaulting JV,[1] her step-grandson. We find that cumulative error denied Venegas a fair trial because (1) the trial court improperly excluded the causation testimony of the physician who treated JV for the injuries associated with count II, (2) the trial court improperly admitted two pieces of "other acts" evidence under Washington Rule of Evidence (ER) 404(b), and (3) the prosecutor committed misconduct during closing argument. Therefore, we reverse.

FACTS

I. Background
¶ 2 In 2001, when JV was six years old, his mother died in a car accident. JV went to live with his grandfather, Remil Venegas, and his wife, Loni Venegas.[2] According to JV, Venegas frequently abused him over the years by punching, kicking and choking him, beating him with sticks and kitchen utensils, and burning him with hot water. Venegas denied the abuse.
¶ 3 The State charged Venegas with first degree assault of a child (count I)[3] and two counts of second degree assault of a child (counts II and III).[4],[5]

II. Trial
¶ 4 Venegas's six-week trial began on April 21, 2008. The State's witnesses testified consistent with the following facts.

A. Facts Pertaining to First Degree Assault of a Child (Count I)

1. Substantial Bodily Harm
¶ 5 On June 25, 2007, JV ran away from home. JV testified that he ran away because Remil and Venegas beat him after somebody *816 knocked over the leaf blower that JV had placed in the garage.[6] Venegas hit JV on his face, chest, and stomach, and choked him, leaving nail marks on his throat. Remil also hit and choked JV.[7] After the assault, JV packed his bags and went to the home of MJ, his best friend and neighbor. MJ's mother, Rosa Broadnax-Johnson, described JV's speech as "stuttering and shaky." 5a Report of Proceedings (RP) at 294. She took photographs of a red area on JV's cheek that was "a little bit swollen" and noticed scratch marks on JV's neck. 5a RP at 294, 299. Broadnax-Johnson called Child Protective Services (CPS). About three weeks later, a police officer who spoke with JV noticed "crescent shaped" marks on JV's neck. 16 RP at 1813. The responding CPS investigator observed red marks on JV's neck.

2. "Pattern or Practice" of Assault
¶ 6 At trial, JV testified as follows to abuse by Venegas over many years. Venegas frequently beat JV with a stick, leaving bruises, welts, cuts, and injuries that sometimes caused him to limp. She punched his face, leaving bruises and fat lips. She kicked his legs, testicles, and stomach when he did not complete his chores to Venegas's liking. If he did not scrub the bathtub correctly, Venegas turned on burning hot water with JV in the tub. Once, the hot water blistered JV's feet, which left the skin on his right foot looking "different." 12 RP at 1332. Venegas hit JV's feet with a hammer, leaving bruises and cuts. On one occasion, she scraped the backs of JV's legs with a metal fork and poured vinegar into the wounds. Another time, she forced him to repeatedly "belly flop" into the pool even after he had bloodied his nose by doing so. 11 RP at 1317. JV had to stay home from school and do chores if he had bruises or other marks.
¶ 7 Several of JV's teachers at Collins Elementary School and Ford Middle School observed JV's injuries and notified CPS. On September 23, 2003, JV's third grade teacher noticed a bruise on JV's cheek. She called CPS in January 2004 after noticing a lip abrasion and a bruise on his shoulder. Another teacher made two separate reports to CPS in September 2004 after various teachers had noticed bruises on JV's face and a cut lip. On September 26, 2005, JV's fifth grade teacher reported a "purple bruise" on JV's eye. 4 RP at 246. On March 1, 2006, the same teacher reported another bruise. In February 2007, JV's sixth grade language arts teacher observed bruises on his cheeks. She also noticed injuries on other occasions and contacted CPS. JV testified that he always gave his teachers excuses, which Venegas provided, for how the injuries had occurred.
¶ 8 Other witnesses also observed JV's injuries. In the summer of 2005, AC, Remil's biological daughter, noticed that JV had bruises and cuts. Once, after JV did not finish his chores, Venegas ordered him downstairs. AC heard a sound like the "twirl [of] a bat" and noticed red marks on JV's hands when he came upstairs. 4 RP at 206. KP, who is AC's cousin, testified that during that same time period, she saw Venegas slam JV's face into the pool table "about seven times," causing his chin and mouth to bleed. 6 RP at 597. Venegas's 10-year old son DV saw Venegas punch JV in the arm "once or twice."[8] 14 RP at 1684.

B. Facts Pertaining to Second Degree Assault of a Child (Count II)
¶ 9 JV testified that, on February 28, 2007, Venegas would not let him use the bathroom while he was unloading the dishwasher. He accidentally urinated, and Venegas forced him to clean up his urine by mopping it up with his clothes while still wearing them. Venegas then "stomp[ed]" on JV's head "[m]ore than one time," which opened a cut on his chin. 11 RP at 1289-90. Venegas's son DV heard a "big bang, thump, on the *817 ground, just like a stomp" from a nearby room. 15 RP at 1764. After the incident, Venegas took JV to see Dr. Douglas Attig, the family physician.
¶ 10 Dr. Attig closed JV's cut, which was 2.75 centimeters in length, with approximately 12 stitches. JV told Dr. Attig that he had cut his chin after slipping on water in the kitchen and hitting his chin on either the floor or counter. JV testified that Venegas told him to tell Dr. Attig this story. JV provided similar explanations to sixth grade teachers who asked about the stitches.

C. Facts Pertaining to Second Degree Assault of a Child (Count III)
¶ 11 JV testified that, on another occasion,[9] Venegas made him perform squats for "an hour or more" as punishment. 11 RP at 1285. When he did not bend his knees low enough, Venegas repeatedly struck JV in the face. 2 RP at 1284. Her strikes left marks on JV's face and knocked out a tooth.
¶ 12 On March 23, 2007, JV's sixth grade shop teacher asked JV about bruising on his face from "the top of his forehead down to his chin." 7 RP at 670. The teacher stated "[i]t . . . just didn't add up to see an 11-year-old with his face bruised as [badly] as his was." 7 RP at 667. JV had bruises on his face in the shape of somebody's knuckles. JV gave him an explanation for the injury, which the shop teacher accepted. Three days later, JV's language arts teacher noticed a yellow bruise on JV's face right above a missing right molar. Later, the shop teacher told JV that he did not believe JV's earlier explanation, and JV told him that Venegas had injured him. The shop teacher called CPS.

D. "Other Acts" Testimony
¶ 13 At trial, Katherine Trezise, JV's third grade teacher, testified that although she recommended JV for the school's gifted program, "Mrs. Venegas said she did not want [JV] to be in the gifted program because he didn't know his multiplication and division facts." 9B RP at 1000. Earlier, the trial court had denied Venegas's motion in limine to exclude this evidence as irrelevant and inadmissible under ER 403. The trial court stated, "I am going to deny [Venegas's] motion in limine, weighing both sides of the issue. . . . I think it's admissible because of what the State's theory is, that there's a motivation, that there's a pattern for what they are accusing [Venegas] of." 9a RP at 919-20.
¶ 14 Heather Hasse, a CPS investigator, testified that CPS planned to place JV in foster care on July 9, 2007, about two weeks after he ran away from home. Hasse called the Venegas household to ask them to sign the relevant paperwork. In the background, Hasse heard Venegas ask Remil whether they would have to pay for JV's foster care. Venegas told Remil that she wanted CPS to put in writing that she and Remil would not have to pay for JV's foster care. The investigator testified that Venegas sounded angry during this exchange.
¶ 15 Before Hasse testified about Venegas's statement, Venegas objected to this evidence as irrelevant and inadmissible under ER 403. The State argued that the testimony was relevant because:
[Venegas] hasn't expressed any concern over the child, she is clearly angry about money . . . [and] the State's theory is, despite her significant distaste for this child, she continues to keep him in their house. . . [which] is motivated by money. . . . So, when [JV] becomes a financial burden upon her, she is upset. She's furious.
7 RP at 756. The trial court overruled the objection, finding that the evidence was admissible because "instead of getting money,[[10]] now it is going to cost [Venegas and Remil] money." 7 RP at 757.
¶ 16 Additionally, the State presented testimony, sometimes without defense objection, that Venegas: (1) treated JV differently than her other children on their birthdays, (2) *818 took away gifts from JV, (3) did not allow JV to attend his best friend's birthday party, (4) did not allow JV to eat with the family, (5) forced JV to re-write a poem about his mother's death, (6) did not allow JV to play with toys and required him to do more chores than the other children while receiving fewer privileges, (7) restricted contact between JV and his best friend and eventually forbid JV's friends from visiting the house, (8) repeatedly called JV a "[d]umb ass, dumb fuck, fuck-up, asshole, shithead, faggot" and "bad," "useless," "slow" and "stupid," (9) used profanity around her children,[11] (10) told teachers at parent-teacher conferences that JV was a liar, a bad kid, and a thief, (11) deprived JV of food when he did not do his chores and did not give him enough time to eat breakfast after morning chores, and (12) often locked JV in his room. 4 RP at 186; 12 RP at 1331.

E. Defense's Case
¶ 17 According to the defense, JV fabricated the abuse allegations. Venegas testified that she loved JV like a son and that she never hurt him. The defense introduced numerous photographs and videos to show that JV participated in family and childhood activities. The defense also argued that JV's abuse allegations were inspired by two books that he had read, in which the child suffered similar forms of punishment.

1. JV's Injuries
¶ 18 Venegas testified that JV's injuries stemmed from fights with other children, wrestling, throwing snowballs, and falling down the stairs. According to Venegas, JV told her that he obtained the injuries to his face and tooththe basis of count IIIby playing "smear the queer" with neighborhood kids. 23 RP at 2788. JAV testified that she never saw Venegas hit JV. Venegas and JAV testified that JV began to act strangely around fifth grade, becoming more aggressive, starving the dog, purposefully injuring himself, and storing bottles of urine in the refrigerator. An 11-year old neighbor, CC, testified that JV always got into fights but told everyone that Venegas beat him up.

2. Expert Testimony
¶ 19 At trial, Dr. Douglas Attig, the Venegas family's physician, testified for the defense. On May 15, 2008, the scheduled day of his testimony, the State noted that it had "just interviewed" Dr. Attig and stated that he "was endorsed as a fact witness." 18 RP at 2020. The State objected to allowing Dr. Attig to offer "any expert opinions" about whether JV's injury could have been caused in the manner that JV described. 18 RP at 2020. The State told the trial court that it had not received notice that Dr. Attig would be offering an expert opinion.[12] The trial court responded:
I'm going to sustain the objection. . . . [I]t's not fair to have the [State] not have the opportunity to cross-examine an expert who has been endorsed as a fact witness. They don't have the opportunity to call another doctor with reference to the cause of the injury. I don't think it's within the rules of evidence. This is a fact witness, happens to be a physician who will testify as to what he did in treating, but not how it was caused.
18 RP at 2022-23. Defense counsel proposed that the trial court "allow the State an opportunity to interview [Dr. Attig]" as an alternative to excluding his testimony. 18 RP at 2023. The trial court replied: "[An] [i]nterview is not going to get it done . . . [The State has] to get another expert. They have to be prepared how to cross-examine your expert, and I am not going to take that time now in the middle of the trial." 18 RP at 2023.
¶ 20 After the trial court's ruling, the defense made an offer of proof outside the jury's presence. Dr. Attig described his qualifications and testified that he treated JV for a "[c]hin laceration" on February 28, 2007. 18 RP at 2028. JV told Dr. Attig that *819 he had slipped on the kitchen floor and struck his chin on the floor, but JV had no bruises on his head or neck and did not report head or neck pain. Defense counsel then asked the following questions:
Q: If the boy said that he received the injury by lying down on the floor, on his stomach, with his chin next to the ground, and that his head was slammed into the floor with a foot of another person, in the back of the head, do you have an opinion to a reasonable medical certainty as to whether or not the injury you saw was consistent with that causation?
A: The injury I saw possibly could be due to that, but Iit's highly unlikely without other, you know, collateral damage. . . .
Q: Do you have an opinion to a reasonable medical certainty as to whether or not the injury that you saw was caused by [JV] being stomped [on] the back of the head?
A: Yes, I have an opinion, and I don't think he was.
Q: Do you hold that opinion to a reasonable medical certainty?
A: Yes.
18 RP at 2030-31. After the jury was brought back in, Dr. Attig testified that JV had no other injuries to his face and that his chin laceration was consistent with slipping and hitting his chin on the floor.

F. State's Closing Argument
¶ 21 During closing argument, the prosecutor stated, "In order to find the defendant not guilty, you have to say to yourselves: `I doubt the defendant is guilty, and my reason is'blank." 27A RP at 3286. The defense did not object to this statement.
¶ 22 The prosecutor[13] began her rebuttal argument as follows:
[State]: Counsel says the defendant is presumed innocent and that the State bears the burden of proof and she's absolutely right. The defendant is presumed innocent and the State does bear the burden. We bear that burden gladly, but that presumption of innocence, ladies and gentlemen, that presumption erodes each and every time you hear evidence that the defendant is guilty.
[Defense]: I object. That's a misstatement of the law.
The Court: It's argument. I'll allow it.
[State]: Every single time that evidence is presented that the defendant is guilty as charged, then that presumption erodes little by little, bit by bit, and at the conclusion of all the evidence, including the defendant's witnesses and the defendant, herself, and that presumption no longer exists, then that's when the State has proven the case beyond a reasonable doubt. . . .
27B RP at 3354-55.
¶ 23 On June 6, 2008, the jury convicted Venegas on all counts. Venegas appeals.

ANALYSIS

Cumulative Error
¶ 24 Venegas argues that cumulative error prevented her from receiving a fair trial. She contends that the trial court improperly excluded Dr. Attig's expert testimony and improperly admitted two pieces of ER 404(b) "other acts" evidence. We agree that the trial court erred in both of these instances. Venegas also asserts, and we agree, that the prosecutor committed misconduct during closing argument. Therefore, we find that cumulative error denied Venegas her right to a fair trial.

A. Standard of Review
¶ 25 Under the cumulative error doctrine, we may reverse a defendant's conviction when the combined effect of errors during trial effectively denied the defendant her right to a fair trial, even if each error standing alone would be harmless. State v. Weber, 159 Wash.2d 252, 279, 149 P.3d 646 (2006); State v. Hodges, 118 Wash.App. 668, 673-74, 77 P.3d 375 (2003). The doctrine does not apply where the errors are few and have *820 little or no effect on the trial's outcome. See Weber, 159 Wash.2d at 279, 149 P.3d 646.

B. Expert Testimony
¶ 26 Venegas first argues that the trial court imposed an unjust CrR 4.7(h)(7) discovery sanction by preventing Dr. Attig's testimony that he believed to a reasonable medical certainty that JV's chin laceration could not have been caused by a stomp to the head. We agree.
¶ 27 Discovery decisions based on CrR 4.7 are within the trial court's sound discretion. State v. Hutchinson, 135 Wash.2d 863, 882, 959 P.2d 1061 (1998). A trial court abuses its discretion when it makes decisions based on untenable grounds or for untenable reasons. State v. Foxhoven, 161 Wash.2d 168, 174, 163 P.3d 786 (2007) (quoting State v. Thang, 145 Wash.2d 630, 642, 41 P.3d 1159 (2002)).
¶ 28 Venegas initially argues that the State knew that Dr. Attig would testify and, therefore, CrR 4.7(b)(1) did not require her to inform the State that she planned to have Dr. Attig testify as to causation. This argument fails. CrR 4.7(b)(1) states:
[T]he defendant shall disclose to the prosecuting attorney the following material and information within the defendant's control no later than the omnibus hearing: the names and addresses of persons whom the defendant intends to call as witnesses at the hearing or trial, together with any written or recorded statements and the substance of any oral statements of such witness.

(Emphasis added). The rule clearly required Venegas to inform the State of the "substance" of Dr. Attig's expected oral statements at trial. CrR 4.7(b)(1); see also State v. Greiff, 141 Wash.2d 910, 919, 10 P.3d 390 (2000) (finding that the State violated its analogous discovery obligations under CrR 4.7(a)(1) by neglecting to inform defense counsel that a witness's testimony would differ in substance from his testimony at a prior proceeding). Here, the State believed that Dr. Attig would only testify about JV's treatment. Venegas violated CrR 4.7(b)(1) by not informing the State that Dr. Attig would also testify as to causation.
¶ 29 Next, Venegas argues that the trial court's decision to exclude Dr. Attig's testimony on causation was an unjust CrR 4.7(h)(7) discovery sanction. That rule reads in pertinent part:
[I]f . . . a party has failed to comply with an applicable discovery rule . . . the court may order such party to permit the discovery of material and information not previously disclosed, grant a continuance, dismiss the action or enter such other order as it deems just under the circumstances.
CrR 4.7(h)(7)(i). The "deems just" language gives a trial court discretion to exclude a defense witness as a sanction for a discovery violation. Hutchinson, 135 Wash.2d at 881-84, 959 P.2d 1061 (quoting CrR 4.7(h)(7)(i)). Excluding evidence is an "extraordinary remedy" under CrR 4.7(h) that "should be applied narrowly." Hutchinson, 135 Wash.2d at 882, 959 P.2d 1061.
¶ 30 The Hutchinson court identified four factors that a trial court should consider when determining whether to exclude evidence as a sanction for a discovery violation. 135 Wash.2d at 882-83, 959 P.2d 1061 (citing Taylor v. Illinois, 484 U.S. 400, 415 n. 19, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988)). The trial court should weigh: (1) the effectiveness of less severe sanctions; (2) the impact of witness preclusion on the evidence at trial and the outcome of the case; (3) the extent to which the witness's testimony will surprise or prejudice the State; and (4) whether the violation was willful or in bad faith. Hutchinson, 135 Wash.2d at 882-83, 959 P.2d 1061.
¶ 31 Here, the trial court placed decisive emphasis on the third Hutchinson factor. It noted that Dr. Attig's proposed causation testimony had surprised the State, which would have to locate a medical expert mid-trial to rebut Dr. Attig's testimony. The trial court concluded, "I am not going to take that time now in the middle of the trial." 18 RP at 2023.
¶ 32 The other three Hutchinson factors do not support the "extraordinary remedy" of exclusion here. Hutchinson, 135 Wash.2d at 882, 959 P.2d 1061. First, the trial lasted *821 over three more weeks after Dr. Attig testified. Therefore, postponing Dr. Attig's testimony until the State could locate an expert could have served as an effective, less severe sanction to prevent prejudicial surprise to the State. See, e.g. Hutchinson, 135 Wash.2d at 881, 959 P.2d 1061 (stating that a party's failure to identify witnesses in a timely manner is "appropriately remedied" by continuing trial to give the nonviolating party time to interview the new witness). Second, excluding Dr. Attig's causation testimony strongly undermined Venegas's defense on count II. In contrast to counts I and III, the State presented no clear evidence that corroborated JV's testimony about how he cut his chin. Had the jury heard from Dr. Attig that it was highly unlikely that JV's injury occurred as JV described it, the jury may well have disbelieved JV's testimony. Finally, defense counsel's discovery violation appeared to be an oversight rather than a willful or bad faith violation.
¶ 33 In sum, we find that the trial court's rationale for excluding Dr. Attig's testimony[14] was based on untenable grounds. Given that the trial lasted three additional weeks, the trial court placed too much emphasis on the fact that Dr. Attig's causation testimony would surprise the State. More importantly, Dr. Attig's testimony directly impeached JV's credibility on count II, and it might have led the jury to question JV's testimony on the other two counts. Because this case largely turned on the jury's assessment of witness credibilityas the State acknowledged at oral argumentwe believe that it was unreasonable for the trial court to exclude Dr. Attig's medical opinion on the basis that it did not want to "take ... time... in the middle of the trial" in order to permit the State to find an expert to rebut Dr. Attig's testimony. 18 RP at 2023.

C. Prosecutorial Misconduct
¶ 34 Venegas alleges that the prosecutor committed "misconduct" by misstating the law on the presumption of innocence. Appellant's Br. at 48. "The presumption of innocence is the bedrock upon which the criminal justice system stands." State v. Bennett, 161 Wash.2d 303, 315, 165 P.3d 1241 (2007). We find that the prosecutor committed flagrant misconduct.[15]
¶ 35 During closing argument, the prosecutor stated, "In order to find the defendant not guilty, you have to say to yourselves: `I doubt the defendant is guilty, and my reason is'blank."[16] 27A RP at 3286. We recently analyzed similar remarksalso by a deputy Pierce County prosecutorand noted that they were improper:
The jury need not engage in any such thought process. By implying that the jury had to find a reason in order to find [the defendant] not guilty, the prosecutor made it seem as though the jury had to find [the defendant] guilty unless it could come up with a reason not to. Because we begin with a presumption of innocence, this implication that the jury had an initial affirmative duty to convict was improper. Furthermore, this argument implied that [the defendant] was responsible for supplying such a reason to the jury in order to avoid conviction.
State v. Anderson, 153 Wash.App. 417, 431, 220 P.3d 1273 (2009). We reiterate that prosecutors who continue to employ an improper "fill-in-the-blank" argument needlessly risk reversal of their convictions.
*822 ¶ 36 Later, in rebuttal argument, the prosecutor stated:
The defendant is presumed innocent and the State does bear the burden. We bear that burden gladly, but that presumption of innocence ... erodes each and every time you hear evidence that the defendant is guilty.... Every single time that evidence is presented that the defendant is guilty as charged, then that presumption erodes little by little, bit by bit, and at the conclusion of all of the evidence, including the defendant's witnesses and the defendant, herself, and that presumption no longer exists, then that's when the State has proven the case beyond a reasonable doubt.
27B RP at 3354-55. This is also a clear misstatement of the law. The presumption of innocence continues "throughout the entire trial" and may only be overcome, if at all, during the jury's deliberations. 11 Washington Practice: Washington Pattern Jury Instructions: Criminal 4.01, at 85 (3d ed. 2008) (WPIC); Bennett, 161 Wash.2d at 317-18, 165 P.3d 1241 (mandating the use of WPIC 4.01 in every criminal case, as was done here). The "bedrock upon which [our] criminal justice system stands" does not erode simply because the State presents witnesses that support its theory of the case. Bennett, 161 Wash.2d at 315, 165 P.3d 1241. The prosecutor committed flagrant misconduct by repeatedly attacking Venegas's presumption of innocence with improper arguments that had no basis in law.

D. ER 404(b) "Other Acts" Evidence
¶ 37 Venegas contends that the trial court improperly admitted two pieces of "other acts" evidence under ER 404(b) over defense objection: (1) Venegas's statements that she did not want JV in his school's gifted program, and (2) Venegas's statements that she did not want to pay for JV's foster care. We find that the trial court erred by failing to weigh the probative value of this ER 404(b) evidence against its prejudicial effect on the record.
¶ 38 ER 404(b) prohibits a trial court from admitting "[e]vidence of other crimes, wrongs, or acts[[17]] ... to prove the character of a person in order to show action in conformity therewith." Such evidence may be admissible for another purpose, including proof of motive, opportunity, intent, preparation, plan, knowledge, or identity. ER 404(b). Prior to the admission of ER 404(b) evidence, the trial court must (1) find by a preponderance of the evidence that the act occurred, (2) identify the purpose of admitting the evidence, (3) determine the relevance of the evidence to prove an element of the crime, and (4) weigh the probative value of the evidence against its prejudicial effect. Fisher, 165 Wash.2d at 745, 202 P.3d 937. This analysis must be conducted on the record. Foxhoven, 161 Wash.2d at 175, 163 P.3d 786.
¶ 39 We review a trial court's decision to admit evidence under ER 404(b) for abuse of discretion. Fisher, 165 Wash.2d at 745, 202 P.3d 937. Failure to adhere to the requirements of an evidentiary rule can be an abuse of discretion. Foxhoven, 161 Wash.2d at 174, 163 P.3d 786.
¶ 40 In admitting the gifted program testimony, the trial court identified a permissible ER 404(b) purposeproof of motive[18]but it failed to balance this probative value against the potential prejudicial effect of the evidence. It is not at all clear that a proper balancing of these values should have resulted in admission. For each count, the State already had powerful motive evidence in the form of the other charged assaults. Evidence of other mistreatment of JV would appear to add little to the scale on motive. In any case, without making a proper ER 404(b) analysis, the trial court should not have permitted this testimony.
*823 ¶ 41 The trial court also acted beyond its discretion by permitting Hasse, the CPS investigator, to testify that Venegas appeared upset and angry about having to pay for JV's foster care. The trial court failed to articulate a proper purpose for this testimony under ER 404(b), and again it did not balance the evidence's probative value against its prejudicial effect on the record. On this record, this evidence also should have been excluded.
¶ 42 We conclude that the accumulation of errors discussed above is of sufficient magnitude that reversal is necessary.[19] As both parties acknowledged at oral argument, this case largely turned on witness credibility. The parties presented the jury with two diametrically opposed versions of the events. Rather than trusting the jury to reach a proper conclusion after listening to dozens of witnesses over the course of a six-week trial, the State twice made arguments that impinged on Venegas's presumption of innocence.[20] Additionally, the trial court levied an excessive CrR 4.7(h)(7) discovery sanction that prevented the defense from potentially presenting expert testimony that JV's chin injurythe basis of count IIcould not have occurred as JV described it. Because JV's testimony was the only evidence the State presented to meet its burden on this count, the availability of expert testimony to rebut JV's testimony was crucial. Moreover, had the jury heard expert testimony that undermined JV's version of events on one count, the jury might have viewed JV's testimony with respect to the other counts in a different light. Finally, the trial court failed to balance the prejudicial effect of "other acts" evidence against its probative value. Each of these errors was significant, and we believe that their cumulative impact on Venegas's trial was severe enough to warrant reversal of her convictions under the cumulative error doctrine.
¶ 43 We reverse.
We concur: BRIDGEWATER and ARMSTRONG, JJ.
NOTES
[1] We use the initials of minors in order to protect their privacy.
[2] To avoid confusion, we refer to Loni Venegas by her surname and to Remil Venegas by his first name. We intend no disrespect.
[3] RCW 9A.36.120
[4] The corrected amended information charges Venegas with second degree assault under RCW 9A.36.130(1)(a), which reads:

A person eighteen years of age or older is guilty of the crime of assault of a child in the second degree if the child is under the age of thirteen and the person . . . [c]ommits the crime of assault in the second degree, as defined in RCW 9A.36.021, against a child. . . .
The relevant part of RCW 9A.36.021 states: "A person is guilty of assault in the second degree if he or she, under circumstances not amounting to assault in the first degree . . . [i]ntentionally assaults another and thereby recklessly inflicts substantial bodily harm[.]" The legislature's 2003 and 2007 amendments to RCW 9A.36.021 do not affect the present analysis. See Laws of 2007, ch. 79, § 2; Laws of 2003, ch. 53, § 64.
[5] Venegas does not dispute that JV was "under the age of thirteen" when each of the charged assaults allegedly occurred. See RCW 9A.36.120,.130.
[6] On cross-examination, JV also stated that Venegas hit him because she was angry that he was doing his chores slowly and thought he had vandalized a neighbor's car.
[7] Remil was charged as a codefendant, but his trial was severed.
[8] Apart from JV's extensive testimony, KP's and DV's observations appear to be the only other direct evidence of Venegas's physical abuse.
[9] The information alleged that this incident occurred between March 1, 2007 and April 1, 2007.
[10] Venegas and Remil received Social Security survivorship benefits for JV in lieu of child support from JV's father, who JV's guardian could not locate. They also received reimbursements for JV's clothing, medical and legal expenses.
[11] The State introduced this testimony to rebut the testimony of JAV, Venegas's 15-year old daughter, that Venegas did not use certain profane words around her children.
[12] Venegas argued that this was "a preposterous notion" and noted that the State had listed Dr. Attig as a potential witness. 18 RP at 2021.
[13] Two Pierce County deputy prosecutors split trial duties and divided closing and rebuttal arguments. We refer to the singular "prosecutor" throughout this opinion.
[14] We leave it for the trial court to determine whether Dr. Attig qualifies as an expert under ER 702.
[15] Prosecutorial misconduct is grounds for reversal where there is a substantial likelihood that the improper conduct affected the jury. State v. Fisher, 165 Wash.2d 727, 747, 202 P.3d 937 (2009). A defendant's failure to object to misconduct prosecutor's improper remark at trial constitutes waiver on appeal unless the remark was "`so flagrant and ill-intentioned that it evinces an enduring and resulting prejudice'" incurable by a jury instruction. State v. Gregory, 158 Wash.2d 759, 841, 147 P.3d 1201 (2006) (quoting State v. Stenson, 132 Wash.2d 668, 719, 940 P.2d 1239 (1997)).
[16] Although the defense failed to object to the prosecutor's statement, we find that the defense did not waive this error because the remark was "`so flagrant and ill-intentioned that it evinces an enduring and resulting prejudice' incurable by a jury instruction." See Fisher, 165 Wash.2d at 747, 202 P.3d 937 (quoting Gregory, 158 Wash.2d at 841, 147 P.3d 1201).
[17] "Other acts" that are potentially inadmissible under ER 404(b) include not only prior bad acts and unpopular behavior but "any evidence offered to `show the character of a person to prove the person acted in conformity' with that character at the time of a crime." Foxhoven, 161 Wash.2d at 175, 163 P.3d 786 (quoting State v. Everybodytalksabout, 145 Wash.2d 456, 466, 39 P.3d 294 (2002)).
[18] Motive is "[s]omething, esp[ecially] willful desire, that leads one to act." Black's Law Dictionary 1110 (9th ed.2009).
[19] We note that Venegas made several other arguments on appeal related to prosecutorial misconduct and ineffective assistance of counsel. Since we find that reversal is warranted based on the errors discussed in this opinion, we need not address these additional errors.
[20] As previously noted, the State misstated that law and improperly attacked Venegas's presumption of innocence when it made these arguments:

In order to find the defendant not guilty, you have to say to yourselves: "I doubt the defendant is guilty, and my reason is"blank.
27A RP at 3286.
Every single time that evidence is presented that the defendant is guilty as charged, then that presumption erodes little by little, bit by bit, and at the conclusion of all of the evidence, including the defendant's witnesses and the defendant, herself, and that presumption no longer exists, then that's when the State has proven the case beyond a reasonable doubt.
27B RP at 3354-55.