# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 50892-3-II |
| Respondent, | UNPUBLISHED OPINION |
| v. | |
| ANDRE VARGAS, | |
| Appellant. | |

GLASGOW, J. — Andre Vargas was convicted of four counts of third degree child rape for raping his daughter during the summer before her ninth grade year when she was 14. At trial, the State presented testimony from the victim, people she had told about the sexual abuse when she was a senior in high school, and an expert on delayed disclosure. The State presented no physical evidence and Vargas did not testify.

Vargas argues that (1) improper opinion testimony deprived him of a fair trial, (2) the trial court erred by admitting hearsay evidence, (3) cumulative error deprived him of a fair trial, (4) the court erred in imposing several conditions of community custody, and (5) the court erred in imposing a $200 criminal filing fee. He also filed a statement of additional grounds.

We affirm Vargas's convictions and remand for the trial court to strike certain invalid conditions of community custody and the criminal filing fee.

FACTS

MV is the daughter of Andre and Kimberly Vargas. MV claimed that in the summer before her freshman year of high school, when she was 14 years old, Vargas sexually abused her for a period of about three months.

According to MV, the abuse always occurred in her parents' bedroom or bathroom while Kimberly was away at work. The abuse included four separate incidents that formed the bases for four counts of child rape. MV also claimed that Vargas showed her a dildo, condoms, a pornographic DVD, and a pornography video on his cell phone showing a woman performing fellatio on a horse.

MV did not immediately tell anyone about the abuse. She first told her friend MM at least several months after the abuse stopped.[1] MV testified that she did not want MM to report the abuse because MV did not want to ruin her family, especially because her brothers were still in school.

It was not until her senior year that MV told her mother, Kimberly. MV said she wanted to tell the police, but she and Kimberly decided to wait. MV explained that Kimberly was "really stressed out" because around the same time, they learned that MV's grandmother had cancer and that one of her brothers was in danger of not graduating. Verbatim Report of Proceedings (VRP) (Vol. 3) at 150-55.

In the spring of her senior year, MV told her school counselor, Ryan McIntosh, about the abuse, who reported the allegations to Child Protective Services. Detective Jessica Whitehead then interviewed MV at school, where MV again told the detective about the abuse.

---

[1] MV and MM's testimony conflicted about when this conversation occurred.

Following MV's graduation, Whitehead contacted Vargas and seized and searched his cell phone, but found nothing of evidentiary value. The rest of the Vargas family had moved out of their home. Before leaving, MV searched for, but did not find, the pornography, sex toys, and condoms that Vargas had shown her.

The State charged Vargas with four counts of third degree child rape, alleging that Vargas had raped MV on four occasions when she was 14.

Before trial, the State moved to allow MM, Kimberly, McIntosh, and Whitehead to testify about what MV had told them about the abuse. The State relied on ER 801(d)(1)(iii), which establishes that a testifying declarant's earlier out of court statement "of identification of a person made after perceiving the person" is not hearsay. The State asserted that as a result, MV's identification of Vargas as the perpetrator was admissible. Vargas objected on the basis that identification was not at issue in his case, because the alleged perpetrator was MV's father and MV would be testifying. The trial court admitted the statements for identification purposes only, cautioning the State to frame its questions carefully and to warn those witnesses in advance not to provide details of what MV had told them, just the identification.

Also before trial, the State moved to admit several text messages between Vargas and MV. In one exchange at the end of the summer when the abuse occurred, MV told Vargas: "And you didn't screw up my life you've done the world for me but I'm afraid to ever have a [boyfriend] because of what you've done. There's not a day that goes by that I don't think about that." Ex. 1. Vargas replied: "Me too. And I thought I was your boyfriend." Ex. 1; VRP (Vol. 3) at 133.

In December of that year, a few months after the abuse ended, MV sent and saved another text message to Vargas that read: "I honestly just lost most of my respect for you after you did what you did. My whole life has changed and perspective because of that. I see no value anymore." Ex. 1; VRP (Vol. 3) at 139-40. MV's testimony indicates that Vargas was trying to call her around the same time but she did not answer. There is no other evidence that Vargas acknowledged or responded to that message.

The State argued that if the text messages were authenticated they would be admissible as an admission by a party opponent under ER 801(d)(2). Defense counsel replied: "I have a problem with the alleged victim in this case being the one to authenticate, obviously, text messages. . . . I know the Court hasn't seen the text—but I think it would be hard for anyone to say that it's an admission by a party opponent." VRP (Vol. 2) at 40. The trial court then responded: "I'm leaning towards admissibility, but I think it all really hinges on a very strong foundation being laid as far as where the messages came from. . . . And so if the State can satisfy that and we can get through any potential motions by the defense, I would be inclined to admit this." VRP (Vol. 2) at 45.

At trial, the State offered the text messages and Vargas objected as to foundation for authentication. The State then laid foundation for the text messages and the court admitted them without further objection from Vargas. The court then took a brief recess, at which time defense counsel told the court that she "wanted to put on the record" that although she did not object after the State laid foundation for authenticity, she "wasn't negating [her] objections" from the pretrial motions. VRP (Vol. 3) at 128. The court acknowledged her statement, and neither side pursued the matter further.

At trial, MV explained in detail the progression of sexual abuse over the course of several months when she was 14 years old, including the four charged instances of rape. She recounted that her father told her he was teaching her about boys and sex. She explained that her father stopped after she threatened to kill herself or run away, but only after one last sexual encounter. MV testified that she did not initially tell anyone about the abuse, but her grades suffered dramatically and she abandoned volleyball, which she had previously excelled in. It was not until at least several months later when she reported the abuse to her friend, and then her senior year when she told her mother, a school counselor, and finally the police.

Kimberly, MM, McIntosh, and Whitehead all testified about MV's identification of her father as her abuser. They described her demeanor when doing so, without providing details about what she said. MM testified that MV shared something involving Vargas and that "[y]ou could tell it was pretty much like eating her up inside like she needed to spit it out." VRP (Vol. 4) at 337.

Kimberly testified that MV told her that Vargas "had done something to her" and that MV was "shaking and crying" when she told Kimberly. VRP (Vol. 3) at 219-21. During a series of questions exploring why Kimberly did not immediately go to the police when MV disclosed the abuse, the State asked Kimberly: "Did you believe your daughter?" VRP (Vol. 3) at 228. Kimberly replied: "Yes." VRP (Vol. 3) at 228. Vargas did not object.

McIntosh, the school counselor, testified that MV shared "something" with him involving her father and that the information alarmed him. He reported what he learned to Child Protective Services. McIntosh also described MV's demeanor during this disclosure as "ready and willing

to share something, but it was clearly difficult for her to share. She wasn't shedding tears or overly emotional about it. She was pretty matter of fact." VRP (Vol. 4) at 307.

Whitehead also testified that MV made a disclosure to her, identifying the perpetrator as Vargas. Whitehead further testified that after she interviewed MV she obtained copies of text messages between MV and her father from MV's cell phone. Whitehead interviewed Kimberly, and then contacted Vargas.

The jury found Vargas guilty on all four counts. The court sentenced Vargas to 60 months of confinement and imposed several conditions of community custody upon his release, including prohibitions on using or consuming alcohol, being in areas where children's activities regularly occur, using the Internet, and using any computer, phone, or computer-related device with access to the Internet. The court also imposed a $200 criminal filing fee on Vargas, who was indigent.

Vargas appeals his convictions, the imposition of certain community custody conditions, and the criminal filing fee.

ANALYSIS

I. OPINION TESTIMONY

Vargas argues that Kimberly improperly testified about her opinion of MV's truthfulness and this deprived him of a fair trial. Specifically, he challenges one exchange in which the State asked Kimberly: "Did you believe your daughter?" and she replied: "Yes." VRP (Vol. 3) at 228.

Vargas did not object to the State's question, and we generally do not review issues not preserved in the trial court. RAP 2.5(a). Vargas presents two theories to assert that this

6

testimony warrants reversal despite the lack of objection: (1) the admission of Kimberly's improper opinion testimony was manifest constitutional error reviewable under RAP 2.5(a)(3), and (2) the question constituted prosecutorial misconduct that was so flagrant and ill-intentioned that it could not have been cured by a jury instruction. We disagree.

A.      Improper Opinion Testimony

A witness cannot express his or her personal opinion or belief "as to the defendant's guilt, the intent of the accused, or the veracity of witnesses." *State v. Quaale*, 182 Wn.2d 191, 200, 340 P.3d 213 (2014). Here, the State appropriately concedes that Kimberly improperly testified that she believed MV when MV told her about the abuse, a question that should have been left solely for the jury.

The State maintains that nevertheless, Kimberly was not vouching for MV's credibility, but rather establishing her own state of mind at the time MV first disclosed to her. But in *State v. Jones*, we determined that there was "no meaningful difference between allowing an officer to testify directly that he does not believe the defendant and allowing the officer to testify that he told the defendant during questioning that he did not believe him." 117 Wn. App. 89, 92, 68 P.3d 1153 (2003). Regardless of *why* a witness opines on another witness's credibility, the jury improperly learned Kimberly's opinion as to a fact that must be left for the jury.

Even so, because Vargas failed to object at trial, he raises this issue for the first time on appeal and therefore must demonstrate that the brief question and answer amounted to manifest error affecting a constitutional right. RAP 2.5(a)(3). Impermissible opinion testimony implicates the defendant's constitutional right to a jury trial, which includes a jury's independent determination of the facts. *State v. Kirkman*, 159 Wn.2d 918, 927, 155 P.3d 125 (2007). For a

constitutional error to be "manifest" there must be "a showing of actual prejudice." *Id.* at 935.

"'Essential to this determination is a plausible showing . . . that the asserted error had practical

and identifiable consequences in the trial of the case.'" *Id.* (quoting *State v. WWJ Corp.*, 138

Wn.2d 595, 603, 980 P.2d 1257 (1999)).

"Important to the determination of whether opinion testimony prejudices the defendant is

whether the jury was properly instructed." *State v. Montgomery*, 163 Wn.2d 577, 595, 183 P.3d

267 (2008).  We presume the jury followed the court's instructions absent evidence to the

contrary.  *Id.* at 596.  In *Kirkman*, for example, the court concluded there was no prejudice in

large part because the jury was properly instructed that jurors "'are the sole judges of the

credibility of the witnesses.'"  159 Wn.2d at 937 (quoting Clerk's Papers).

Vargas argues that Kimberly's statement that she believed her daughter certainly swayed

the jury, relying on *State v. Johnson*, 152 Wn. App. 924, 219 P.3d 958 (2009).  In *Johnson*,

multiple witnesses testified that the wife of a man accused of sexually abusing a teenaged

neighbor had said that she believed the victim's allegations.  *Id.* at 931-33.  We held that

revealing this fact to the jury "served no purpose except to prejudice the defendant," and that

manifest error denied the defendant his right to a fair trial.  *Id.* at 934.  But in *Johnson*, the

witnesses testified about the defendant's wife's emotional reaction to the teenager's allegations,

saying that she was "hysterical" and "freaked out."  *Id.* at 932-33.  The victim also testified that

the defendant's wife attempted suicide several hours after she learned of the abuse.  *Id.* at 931-

32.  The *Johnson* court reasoned that the witness statements "were highly prejudicial" because

the defendant's "own wife believed the accusations."  *Id.* at 933-34.

Although this case is similar in that there was testimony that the victim's mother believed the allegations against her own husband, Kimberly's testimony simply did not produce the same prejudicial effect as the testimony in *Johnson.* That case involved several witness statements describing in detail the wife's intense reaction to the allegations, including a suicide attempt. *See id*. at 931-33. This case, on the other hand, presents only a fleeting and isolated statement that Kimberly believed MV. There were no other references to this statement, even in closing argument, and no other witness testified as to whether Kimberly believed the allegations.

Moreover, the jury here received the same instruction as the juries in *Montgomery* and *Kirkman*, that jurors are the sole judges of witness credibility. We presume the jury followed the instruction absent any evidence to the contrary. *Montgomery*, 163 Wn.2d at 595. Vargas has not presented any evidence that the jury in this case failed to follow the trial court's instructions, and it is his burden on appeal to make a "plausible showing" of prejudice. *Kirkman*, 159 Wn.2d at 927.

Kimberly's statement was fleeting and isolated, and it lacked the dramatic and inflammatory character of the protracted testimony of multiple witnesses from *Johnson*. We accordingly hold that Vargas has not made a plausible showing that this error, on its own, had practical consequences that affected the trial. Kimberly's improper testimony did not amount to a manifest error requiring reversal.

B.      Prosecutorial Misconduct

Alternatively, Vargas argues that the prosecutor improperly elicited Kimberly's assessment of MV's credibility and this amounted to prosecutorial misconduct.

To prevail on this claim, Vargas must show "'that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and the circumstances at trial.'" *State v. Magers*, 164 Wn.2d 174, 191, 189 P.3d 126 (2008) (quoting *State v. Hughes*, 118 Wn. App. 713, 727, 77 P.3d 681 (2003)). Where, as here, the defendant failed to object, the error is reversible only if it is material to the trial's outcome and could not have been remedied. *State v. Jerrels*, 83 Wn. App. 503, 508, 925 P.2d 209 (1996). The defendant is deemed to have waived any error unless he or she shows the comments were "so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." *State v. Emery*, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012). To meet this heightened standard, "the defendant must show that (1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" *Id.* at 761 (quoting *State v. Thorgerson*, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)).

Cross examination is improper when it seeks to compel a witness's opinion as to whether another witness is telling the truth, because such questioning invades the jury's role and is unfair and misleading. *Jerrels*, 83 Wn. App. at 507. Vargas argues this case is analogous to *Jerrels*, where we held it was misconduct for the prosecutor to ask the victims' mother whether she believed they were telling the truth. *Id.* at 508. Jerrels's daughter and stepchildren, all between the ages of 6 and 11, testified that he had raped and molested them. *Id.* at 505. A doctor from the sexual assault clinic testified that one child showed no medical evidence of sexual abuse, but that she observed scarring on one of the other children consistent with sexual abuse. *Id.* at 505-06. Jerrels's wife testified that she never observed any inappropriate activity or had any suspicions of sexual abuse. *Id.* at 506. On cross-examination, the prosecutor repeatedly asked

her whether she believed her children were telling the truth, and she said that she believed that they were. *Id.* at 506-07.

Here, the prosecutor explicitly asked Kimberly whether she believed MV's accusations; in other words, whether MV was telling the truth. This is clearly improper questioning under *Jerrels*. Therefore, because Vargas did not object, the question here is whether the misconduct was material to the trial's outcome and could not have been remedied. *Id.* at 508. In *Jerrels*, we held that the prosecutor's questions were material and highly prejudicial because credibility played such a crucial role in the case. *Id.* We reasoned that "[a] mother's opinion as to her children's veracity could not easily be disregarded even if the jury had been instructed to do so." *Id.* We also noted that no definitive medical evidence linked Jerrels to the abuse, and although two of the young victims provided some corroboration for each other's testimony, there were no other witnesses to the abuse. *Id.*

Although some of the same issues are present here, this case is distinguishable from *Jerrels*. Here, the prosecutor asked only once whether Kimberly believed MV, whereas the prosecutor in *Jerrels* asked several times whether the victims' mother believed them. *See id.* at 507. Vargas's text message to MV stating "I thought I was your boyfriend," was corroborating evidence of MV's accusations, as it suggests some level of inappropriate relationship between them. VRP (Vol. 3) at 133. This case also differs from *Jerrels* because the victims there were 6 and 11 years old, whereas MV had just graduated from high school at the time of trial. The mother's evaluation of her young children's veracity in *Jerrels* would likely have carried more weight than Kimberly's statement here, because the jury could more easily evaluate MV's credibility without relying on a mother's special knowledge of her young children.

11

The single, isolated question from the prosecutor, which was never again referenced at trial, was not "'so flagrant and ill intentioned'" that the curative instruction could not have removed any prejudice. *Id.* at 508 (quoting *State v. Suarez-Bravo*, 72 Wn. App. 359, 367, 864 P.2d 426 (1994)). And the trial court did instruct the jury that it was the sole judge of witness credibility. Accordingly, we hold that this allegation of prosecutorial misconduct does not require reversal.

## II. ADMISSION OF OUT-OF-COURT STATEMENTS

Vargas argues that the improper admission of hearsay evidence affected the outcome of his trial. We disagree.

### A. The Hearsay Rule and Standard of Review for Evidentiary Error

Hearsay is inadmissible unless otherwise provided by the rules of evidence, statute, or court rule. ER 802. Hearsay is an out-of-court statement "offered in evidence to prove the truth of the matter asserted." ER 801(c). Conversely, a statement is not hearsay if it is not offered for the truth of the matter asserted. ER 801(c). And a statement is not hearsay if it is "one of identification of a person made after perceiving the person," the declarant testifies at trial, and the declarant is subject to cross examination concerning the statement. ER 801(d)(1)(iii).

We review de novo a trial court's interpretation of an evidentiary rule. *State v. Foxhoven*, 161 Wn.2d 168, 174, 163 P.3d 786 (2007). When the court has correctly interpreted the rule, we review the decision to admit evidence for abuse of discretion. *Id.* A court abuses its discretion if its decision is based on untenable grounds or made for untenable reasons, which may include a failure to adhere to the requirements of an evidentiary rule. *Id.*

12

Further, an evidentiary error that does not result in prejudice is not grounds for reversal. *State v. Thomas*, 150 Wn.2d 821, 871, 83 P.3d 970 (2004). "'The improper admission of evidence constitutes harmless error if the evidence is of minor significance in reference to the overall, overwhelming evidence as a whole.'" *Id.* (quoting *State v. Bourgeois*, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997)). Whether a nonconstitutional error is harmless depends on whether, "'within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected.'" *State v. Gresham*, 173 Wn.2d 405, 433, 269 P.3d 207 (2012) (quoting *State v. Smith*, 106 Wn.2d 772, 780, 725 P.2d 951 (1986)).

B.      MV's Disclosures

The trial court admitted testimony from Kimberly, MM, McIntosh, and Whitehead under ER 801(d)(1)(iii), explaining that MV had identified her father as her abuser.

Vargas acknowledges that MV's disclosures to McIntosh and Whitehead were admissible because they explained why each took some subsequent action. McIntosh, the school counselor, reported the abuse to authorities and Whitehead began an investigation. Thus, their statements were not offered for the truth of the matter asserted. Although Vargas asserts that these witnesses should not have testified as to MV's demeanor during their conversations with her, her demeanor is not a hearsay "statement" as defined by ER 801. *See State v. Hieb*, 107 Wn.2d 97, 105, 727 P.2d 239 (1986) (mother's testimony of her observations of daughter's demeanor was not hearsay). Nor is there any indication that MV's demeanor when disclosing the abuse was intended as an assertion through nonverbal conduct under ER 801(a)(2).

On the other hand, Vargas argues that Kimberly's and MM's testimony about MV's disclosures to them were improperly admitted.[2] He claims that ER 801(d)(1)(iii) does not apply to MV's disclosures to Kimberly and MM because identity was not at issue in this case. But even if we assume without deciding that these disclosures were improperly admitted as statements of identification, the error was harmless.

MV testified directly and extensively about the four charged incidents of rape and her testimony was unrebutted. We cannot say that additional testimony establishing only that she told her mother and best friend that her father had sexually abused her, without more detail, impacted the outcome of the trial. Indeed, defense counsel could have objected to any of those statements under ER 403 if counsel thought their descriptions of MV's disclosures were overly prejudicial, but no such objections were made. Because there is not a reasonable probability that exclusion of any improperly admitted testimony would have changed the outcome of the trial, we hold that any error was harmless. *See Gresham*, 173 Wn.2d at 433.

C.     Text Messages

Vargas argues the trial court improperly admitted a text sent from MV to him that read: "I honestly just lost most of my respect for you after you did what you did. My whole life has changed and perspective because of that. I see no value anymore." VRP (Vol. 3) at 140.

---

[2] Although Vargas raises and then argues we should decline to apply several other hearsay exceptions, the State concedes that the statements at issue are admissible only as statements of identification pursuant to ER 801(d)(1)(iii) and that Vargas preserved the issue by arguing against their admission at trial. We accordingly accept the State's concessions that no other exceptions to the hearsay rule apply to these statements, and conclude that Vargas preserved the issue for appeal.

Although the testimony reflects that Vargas may have tried to call MV in response, he did not respond by text.

Under ER 801(d)(2)(ii) a statement is not hearsay when it is offered against a party and the opposing party "has manifested an adoption or belief in its truth." A party may manifest adoption of a statement by silence or acquiescence. *State v. Hill*, 6 Wn. App. 2d 629, 640-41, 431 P.3d 1044 (2018), *review granted in part*, 438 P.3d 115 (2019). "Because of the inherently equivocal nature of silence, 'such evidence must be received with caution.'" *Id.* at 641 (quoting *State v. Neslund*, 50 Wn. App. 531, 551, 749 P.2d 725 (1988)). Silence constitutes an admission if (1) the party-opponent heard the accusatory or incriminating statement, (2) the party-opponent was able to respond, and (3) the circumstances were such that it is reasonable to conclude the party-opponent "'would have responded had there been no intention to acquiesce.'" *Hill*, 6 Wn. App. 2d at 641 (quoting *Neslund*, 50 Wn. App. at 551).

Vargas claims this text message was inadmissible hearsay because it was MV's out-of-court statement used to prove the truth of the matter asserted, that he had sexually abused her. Because there is no evidence of how or whether Vargas ever responded to this text message, he claims his failure to respond cannot amount to a statement of a party-opponent by acquiescence under ER 801(d)(2) and is therefore inadmissible.

1. Sufficiency of Objection

At the outset, the State argues that Vargas did not make a reasonably specific objection to preserve this issue for appeal. "The propriety of an evidence ruling will be examined on appeal if the specific basis for the objection is 'apparent from the context.'" *State v. Braham*, 67 Wn.

App. 930, 935, 841 P.2d 785 (1992) (quoting *State v. Pittman*, 54 Wn. App. 58, 66, 772 P.2d 516 (1989)).

"'[W]hen a ruling on a motion in limine is tentative, any error in admitting or excluding evidence is waived unless the trial court is given an opportunity to reconsider its ruling.'" *State v. Powell*, 126 Wn.2d 244, 257, 893 P.2d 615 (1995) (quoting *State v. Carlson*, 61 Wn. App. 865, 875, 812 P.2d 536 (1991)). In other words, when a trial court "'makes only a tentative ruling [on the admission of evidence] subject to evidence developed at trial, the parties are under a duty to raise the issue at the appropriate time with proper objections at trial.'" *Id.* at 256 (quoting *State v. Koloske*, 100 Wn.2d 889, 896, 676 P.2d 456 (1984)).

The trial court tentatively determined the messages were admissible under ER 801(d)(2), contingent on the State laying proper foundation, which the State ultimately did at trial. Vargas contends that this constituted a final ruling on whether the hearsay exception applied, because counsel had articulated her concerns on that front and the court stated it would admit the messages so long as the State laid proper foundation. The State counters that the messages' admissibility was not addressed until trial, at which point Vargas was obligated to renew his objection. Because he did not, the State argues, he failed to preserve the issue for appeal.

The trial court's ruling here was tentative and did not squarely address Vargas's concerns about the admission of a party-opponent issue. Vargas was therefore obligated to renew any objection on that basis at the appropriate time at trial. *See Powell*, 126 Wn.2d at 256. When the State offered the messages for admission and publication at trial, after satisfying Vargas's objection for authentication, Vargas did not object. However, Vargas did signal a desire to preserve his other objections from the parties' pretrial discussions, including presumably his

16

concern that his lack of response to this text message did not constitute an admission sufficient to trigger the hearsay exception. By notifying the trial court of his other continuing objections, Vargas arguably preserved this claimed error for appeal.

2. Harmless Error

However, even if we assume both that Vargas preserved this alleged error for appeal and the trial court did in fact err by admitting the text message, any error was harmless. The improper admission of evidence constitutes harmless error if the evidence is of minor significance compared with the overall body of evidence. *Hill*, 6 Wn. App. 2d at 647.

We hold the outcome of the trial would not have been materially affected had this text message been excluded. MV gave consistent, unwavering testimony describing multiple incidents of abuse, and Vargas did not raise any serious doubt as to her credibility. Furthermore, this specific text message from MV was far less damaging to his case than the other text messages that were properly admitted, particularly Vargas's message saying that he thought he was MV's boyfriend. Because any alleged error was insignificant compared with the overall body of evidence, we hold that any error was harmless.[3]

### III. CUMULATIVE ERROR

Vargas argues that cumulative error deprived him of his right to a fair trial. He contends that the combined effect of the alleged errors discussed above unfairly bolstered MV's credibility to the point that reversal is required.

---

[3] Vargas also argues, in the alternative, that his counsel's failure to provide an adequate objection constituted ineffective assistance of counsel. Because we assume that counsel's objection was sufficient to preserve the alleged evidentiary error, we reject this ineffectiveness claim.

Under the cumulative error doctrine, we may reverse a defendant's conviction when the combined effect of errors during trial effectively denied him his right to a fair trial, even if each error standing alone would be harmless. *State v. Venegas*, 155 Wn. App. 507, 520, 228 P.3d 813 (2010). The doctrine does not require reversal where the errors are few and have little or no effect on the trial's outcome. *Id.*

After carefully reviewing the entire record, we do not believe cumulative error warrants reversal. In light of MV's unwavering testimony describing the multiple incidents of sexual abuse, Vargas's failure to raise significant concerns about her credibility or truthfulness, and the text message from Vargas saying he thought he was her boyfriend, cumulative error does not warrant reversal. We affirm the convictions on all counts.

## IV. COMMUNITY CUSTODY CONDITIONS

Vargas argues that several of his community custody conditions should be stricken because they are not crime-related. Specifically, Vargas challenges conditions prohibiting him from using or consuming alcohol, being in areas where children's activities regularly occur, using the Internet, and using any computer, phone, or computer-related device with access to the Internet. The State concedes Vargas's arguments relating to alcohol use and being in areas where children's activities regularly occur were improperly imposed. We accept the State's concessions.

Sentencing courts have the authority to require offenders to comply with "any crime-related prohibitions" during their term of community custody. RCW 9.94A.703(3)(f). A crime-related prohibition is one that "directly relates to the circumstances of the crime for which the offender has been convicted." RCW 9.94A.030(10).

We review a sentencing court's imposition of crime-related conditions of community custody for abuse of discretion. *State v. Irwin*, 191 Wn. App. 644, 656, 364 P.3d 830 (2015). We review the factual basis for a crime-related condition for substantial evidence. *Id.*

The trial court imposed a condition prohibiting Vargas from using or consuming alcohol. This condition was not imposed as a "crime-related" condition but rather as a special condition for sex offenses under RCW 9.94A.703. CP at 91. RCW 9.94A.703(3)(e) permits sentencing courts to prohibit offenders from "possessing or consuming alcohol." However, Division One of this court has recognized that *using* alcohol is different than *consuming* alcohol, and the statute only authorizes restrictions on the latter and not the former. *State v. Norris*, 1 Wn. App. 2d 87, 99-100, 404 P.3d 83 (2017), *aff'd in part, rev'd in part on other grounds by State v. Nguyen*, 191 Wn.2d 671, 425 P.3d 847 (2018). Hence, the words "use or" should be stricken from this condition.[4]

The trial court imposed a condition that would prohibit Vargas from being in areas where children's activities regularly occur. Here, all of the incidents of abuse occurred in Vargas's home and there was no evidence that he ever sought contact with children who were strangers to him. This condition is not crime-related and should be stricken, consistent with the State's concession.

Vargas challenges conditions that prohibit him from using the Internet or any computer, phone, or computer-related device with access to the Internet. He reasons that there is no evidence that he used the Internet or a computer to carry out the offenses against MV. The State

---

[4] Although the State also concedes that a condition requiring Vargas to obtain an alcohol dependency evaluation should be stricken, it appears the trial court did not check the box to impose this condition in this case.

counters that Vargas used his phone to show MV a video of a woman performing fellatio on a horse during the period of abuse. The State argues that the conditions are appropriate because a modern cell phone is essentially a computer, and Vargas presumably used the Internet to "pull up" the video of the horse. Br. of Resp't at 28-29.

We hold that these conditions are sufficiently connected to the facts underlying Vargas's crime such that it was within the trial court's discretion to impose the condition. Even if Vargas did not use his phone or the Internet during the specific instances of rape, he did use his phone to show MV a pornography video during the time period he was abusing her. This incident formed part of the pattern of abuse, and was arguably relevant to Vargas's "grooming" of MV. Hence, Vargas's phone and Internet use "contributed" to the crime and so the conditions prohibiting their use are sufficiently crime-related. *State v. O'Cain*, 144 Wn. App. 772, 775, 184 P.3d 1262 (2008). The trial court did not abuse its discretion in imposing these conditions.

## V. CRIMINAL FILING FEE

Vargas argues the $200 criminal filing fee was improperly imposed. We agree.

In 2018 the legislature amended RCW 36.18.020(2)(h) to bar imposition of the mandatory criminal filing fee for defendants who were indigent at the time of sentencing under RCW 10.101.010(3)(a)-(c). LAWS OF 2018, ch. 269, § 17. This amendment applies prospectively to cases on direct appeal when the law changed. *State v. Ramirez*, 191 Wn.2d 732, 747, 426 P.3d 714 (2018).

The court found Vargas to be indigent for purposes of appeal. Thus, as Vargas was indigent at the time of sentencing, the $200 criminal filing fee violates the amendment to RCW 36.18.020(2)(h) and should be stricken.

20

No. 50892-3-II

## VI. STATEMENT OF ADDITIONAL GROUNDS

In his statement of additional grounds, Vargas references one text he received from MV and one text he received from Kimberly, but does not include any argument as to their relevance. Although RAP 10.10 does not require Vargas to refer to the record or cite authority, he is required to inform us of the "nature and occurrence of [the] alleged errors." These assertions of error are too vague to allow us to identify the issues and we do not reach them.

### CONCLUSION

We affirm Vargas's convictions and remand for the trial court to strike the improper conditions of community custody as described above and to strike the $200 criminal filing fee.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Glasgow, J.

We concur:

Worswick, J.

Maxa, C.J.

21