**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| STATE OF WASHINGTON, | No. 52505-4-II |
| Respondent, | |
| v. | |
| JERRY C. THOMPSON, | UNPUBLISHED OPINION |
| Appellant. | |

SUTTON, A.C.J. — Jerry C. Thompson appeals his July 2018 convictions for multiple counts of sex offenses against two minor children. Thompson argues that he received ineffective assistance of counsel because defense counsel failed to object to joinder for trial or object to other evidence. Thompson argues that these cumulative errors denied him of his right to a fair trial.

We hold that Thompson fails to prove that counsel was deficient by failing to object to joinder or certain evidence, and even if counsel was deficient, he fails to prove prejudice. We affirm Thompson's convictions.

FACTS

I. BACKGROUND FACTS

A. PEGGY AND JERRY THOMPSON

Peggy and Jerry Thompson were a married couple. In their house, Thompson slept in a room downstairs and Peggy slept in a separate room upstairs. During the time of the allegations in this case, discussed below, their marriage was strained and they were no longer sexually

intimate.  In 2013, Peggy moved out of the house for a period of time.  Peggy filed for divorce in 2016.

B.  AT

Shauna Thompson is AT's mother.  Peggy and Thompson are AT's grandparents.  AT frequently spent time at her grandparents' house and she had her own room there for when she spent the night—almost every weekend.  At times, AT would sleep with Thompson without Shauna's knowledge; Shauna learned about this after Peggy informed her.  Shauna told Thompson this was inappropriate.

In April 2013, when AT was four years old, she was taking a bath and disclosed to Shauna that Thompson touches her vagina.  AT also said that Thompson told her not to tell anybody or she would get in trouble.

After this conversation, Shauna called Cathy Ammann, her godmother, and Rachel Hamilton, her friend.  Rachel and her sister, Sigournia Hamilton, came over to Shauna's house.  When they arrived, Shauna was speaking to Peggy on the phone about what AT had disclosed.

After this and around AT's fifth birthday, Shauna moved into an apartment with Rachel and Sigournia in May 2013, so they could help Shauna with childcare.  Shauna continued to allow AT to see Peggy but limited AT's contact with Thompson.  AT missed Peggy and started telling Shauna that "[i]t didn't happen" while stating, "I want to see my grandma."  Verbatim Report of Proceedings (VRP) (May 2, 2018) at 819.  AT started having issues with bedwetting, which issues continued for several years.

One day shortly after moving into the new apartment, AT told Sigournia that "Jerry Thompson had [AT] give him oral sex and . . . that he had done oral sex to her."  VRP (April 23,

2

2018) at 64. AT also disclosed that she slept in the same bed with Thompson at times, and sometimes he would "put his hand under her nightgown and touch her chest." VRP (April 24, 2018) at 168. She disclosed that Thompson took baths and showers with her and that it hurt when he touched her vagina. She disclosed that when they took naps and slept together at night, they played games involving their private parts. AT said Thompson put his tongue in her mouth and she put her mouth on his private part.

Following this disclosure, Shauna, Rachel, and Sigournia went to Thompson's house to confront him.

> [Sigournia]: I told [Thompson] that I had a conversation with [AT] that day, and [AT] advised to me that he and her – that he was touching her inappropriately, and I wanted to know what was going on. And from there, he didn't deny it. He just started immediately commenting on [AT]'s appearance and her development, and he started talking about Shauna and her parenting.
>
> [State]: Now when you say he was commenting on [AT]'s appearance and her development, can you say what he was saying about that?
>
> [Sigournia]: I can try. He said that her body figure was – developed fastly [sic] because she was biracial and that he always had an attraction to women of color and that he was just glorifying how his daughter – his granddaughter was attractive to him.
>
> . . . .
>
> [H]e did not deny touching her. In fact, he smirked and chuckled. And I asked him about him and her bathing together, and he mentioned that he's been in [AT]'s life since she was born, and he didn't see anything wrong with that, and it was natural.

VRP (April 24, 2018) at 176-77. Sigournia asked Thompson about sleeping and bathing with AT. "He just said that it was okay. He didn't see anything wrong, that he would kiss her and that he would give her a bath, and he said that sometimes she would ask him to bathe her, and he just [couldn't] help himself to just hop right in with her." VRP (May 8, 2018) at 1221.

3

After this, Shauna called the police and Child Protective Services. AT was forensically examined in October 2013 when she was five years old. During her medical examination, AT made similar disclosures to those made to family members. Shauna once again limited AT's contact with Thompson.

After Thompson's relationship with Shauna began to improve in late 2015, Shauna began to allow AT to go to Peggy's and Thompson's house again. Overnight visits resumed in 2016. Shauna asked Peggy to not leave AT alone with Thompson, but learned later that Peggy often left AT alone with Thompson. In November 2016, AT disclosed to her school counselor that Thompson touched her private parts at night:

> She screamed out, "It's Jerry Thompson, my grandpa," and I said, "Okay, Jerry Thompson, your grandpa, is what?" And then she said, "He touches my private parts at night."

VRP (April 23, 2018) at 98. AT described to the counselor that Thompson touched her with his hands and private parts, and that she felt "yucky." VRP (April 23, 2018) at 99. She stated that she had tried to tell her mother, but her mother just got upset and cried.

AT was forensically interviewed for a second time in November 2016. AT told the interviewer that she was scared of Thompson and she was scared of having to speak in court. AT said she loved Thompson, but that he had done "not nice things." VRP (April 24, 2018) at 192.

AT was nine years old when she testified at trial in 2018. She testified that she loved Thompson before the abuse. She testified that the bad stuff happened when she was younger, that it stopped for a while, and then it started again. She testified that Thompson would frequently take her out of her room at night and bring her to his bedroom, and the "bad stuff" would happen on his bed. VRP (May 2, 2018) at 753. AT described Thompson putting his tongue in her mouth and

touching her private part under her underwear. She also described how Thompson made her put her mouth on his private part by grabbing her hair. AT testified that she was afraid of Thompson because he said he would hurt people if she told anyone about the abuse, and because the "bad stuff" scared her. VRP (May 2, 2018) at 759. AT said that Peggy was the second person she ever told about the abuse. She said that talking about the abuse made her feel bad.

C. DW

Jason Orr is Peggy's biological son, and Bethany Orr is his wife. DW is Bethany's daughter and Thompson's step-granddaughter.

The weekend that Bethany and Jason were married in November 2014, DW was supposed to stay at their apartment with Peggy. DW was 11 years old at the time. Instead, Peggy took DW to her and Thompson's house. Bethany did not know that Thompson had been previously accused of sexually abusing AT.

Friday night, DW slept in a guest bedroom upstairs. Thompson checked on her before she went to sleep. The next morning, DW helped Thompson pull weeds in the yard. As she was dumping the weeds, Thompson came up behind her and "lingered" against her back for about 30 seconds.

That evening, Thompson was watching TV in the living room. DW asked Peggy if there was another TV in the house, and Peggy let her watch TV in Thompson's room. DW fell asleep in his room. She woke up when she heard the door open; she felt a weight dip down on the bed, and she could tell that it was Thompson. She thought that he was checking on her until she realized he had a knife. He said to her, "If you make a sound, I'll cut out your f**king vocal cords." VRP (May 3, 2018) at 927. Thompson raped DW vaginally and ejaculated on her thigh. As he was

leaving the room, he turned his head back and said, "You're my whore." VRP (May 3, 2018) at 933.

The next morning, Peggy told DW that Thompson would drive DW to church. At a stoplight, Thompson "put his hand down the back of [DW]'s neck and with his other hand, he unzipped and undid his pants and he pushed [her] head towards his crotch area." VRP (May 3, 2018) at 939. He then forced DW to give him oral sex. As DW exited the car in the church parking lot, Thompson said, "I enjoyed that. Remember last night, you're my whore." VRP (May 3, 2018) at 942.

DW saw Thompson the next month at Thompson's and Peggy's house. As she was about to leave with her family, he came up behind her and spanked her. His hand lingered on her bottom for a couple of seconds. Bethany observed this and was shocked. She immediately took the children out of the home and spoke to Jason about it.

After this, Bethany noticed DW was "very angry and would have angry outbursts and was very depressed and sad, and she was struggling in school." VRP (May 3, 2018) at 1037. DW began to make gradual disclosures to her mother and counselor about the abuse. DW was forensically interviewed in September 2015, but she only mentioned the incident in Thompson's yard.

In 2016, DW went to a restaurant with her boyfriend and his family. She saw Thompson outside. When DW went to the bathroom, Thompson followed her. Thompson went into the stall DW was in and shut the door, and said, "You're still my whore." VRP (May 3, 2018) at 967, 970. He proceeded to vaginally rape her and ejaculate on her lower back. DW's boyfriend observed DW was distressed when she returned to the table, and she later told him some of what happened

at the restaurant. DW told her mother that she saw Thompson at the restaurant, but she did not tell her about the rape.

At a family Christmas gathering, AT disclosed her abuse to DW. AT confided in DW about being touched when she was staying with Peggy and Thompson, and she pointed to her hip and chest area. DW knew that AT was talking about Thompson. DW then decided to tell her mother about her own abuse.

DW was forensically interviewed a second time in January 2017. During this interview, DW told the interviewer about the events the weekend of her mother's and Jason's wedding.

DW remained embarrassed and afraid to talk about the abuse. Her counselor testified that victims of sexual abuse often have difficulty talking about the details of the abuse. Delayed and gradual disclosure of sexual abuse is common with children.

## II. PROCEDURAL FACTS

The State separately charged Thompson with multiple amended counts of sex offenses involving the abuse of AT and DW.[1] The State moved to join the two trials. Defense counsel did not object; the court granted the motion and stated, "I can understand why defense probably did [not] think it was necessary to respond to that. It was going to be granted in any event." VRP (Mar. 20, 2018) at 12.

Trial began in 2018 and the witnesses testified consistent with the facts above. The jury found Thompson guilty of five counts of first degree rape of a child, one count of second degree rape of a child, and two counts of first degree child molestation. The jury entered special verdicts

---

[1] Before trial, Thompson pleaded guilty to a separate firearms charge.

that AT and DW were members of the same household as Thompson, and that he used his position

of trust to facilitate the crimes. The court also dismissed two counts of second degree rape of DW

following a mistrial. The court sentenced Thompson to an exceptional sentence of 600 months to

life of confinement on each count and imposed legal financial obligations.

Thompson appeals his convictions.

## ANALYSIS

### I. LEGAL PRINCIPLES

Ineffective assistance of counsel is a constitutional error arising from the Sixth Amendment

to the United States Constitution and article 1, section 22 of the Washington Constitution. *See*

*State v. Estes*, 188 Wn.2d 450, 457, 395 P.3d 1045 (2017). To prevail on an ineffective assistance

claim, the defendant must show that (1) defense counsel's representation was deficient and (2) the

deficient representation prejudiced the defendant. *Estes*, 188 Wn.2d at 457-58. Representation is

deficient if, after considering all the circumstances, it falls below an objective standard of

reasonableness. *Estes*, 188 Wn.2d at 458. Prejudice exists if there is a reasonable probability that,

except for counsel's errors, the result of the proceeding would have been different. *Estes*, 188

Wn.2d at 467.

Counsel's conduct is not deficient if it can be characterized as a legitimate trial strategy,

but the relevant question is not whether counsel's choices were strategic, but whether they were

reasonable. *State v. Grier*, 171 Wn.2d 17, 33-34, 246 P.3d 1260 (2011). However, when the

record does not show counsel's reasons for making a particular strategic or tactical choice at trial,

we are unable to determine whether counsel's decision lacked a legitimate strategic basis. *State v. Linville*, 191 Wn.2d 513, 525-26, 423 P.3d 842 (2018). And "when 'the claim is brought on direct appeal, the reviewing court will not consider matters outside the trial record.'" *Linville*, 191 Wn.2d at 525 (quoting *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995)).

## II. FAILURE TO OBJECT TO JOINDER

Thompson argues that defense counsel was deficient by failing to object to joinder. However, Thompson cannot show the absence of any strategic or tactical reasons why counsel did not object to joinder. Counsel's silence does not necessarily mean counsel was deficient. *See Linville*, 191 Wn.2d at 524. And the record here does not establish why counsel failed to object. Because the record does not reflect counsel's reason for deciding not to object, we are unable to determine whether counsel's reason for not objecting was unreasonable and constituted deficient performance. *Linville*, 191 Wn.2d at 524-25.

Because Thompson cannot demonstrate that his counsel performed deficiently, we need not consider whether he suffered prejudice as a result of counsel's decision. *Strickland v. Washington*, 466 U.S. 668, 700, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) ("Failure to make the required showing of either deficient performance of sufficient prejudice defeats the ineffectiveness claim.").

### III. FAILURE TO OBJECT TO OTHER EVIDENCE

Thompson argues that his defense counsel was ineffective because she failed to object to numerous other evidence admitted at trial.[2] We hold that even if there were a few instances where counsel could have objected, Thompson cannot show deficient performance because, just as with counsel's decision not to object to joinder, the record is silent as to counsel's reason for deciding not to object. And because we cannot discern counsel's reason for not objecting, we cannot say that counsel lacked a legitimate strategic basis for declining to object. *Linville*, 191 Wn.2d at 524-25. Thus, because Thompson cannot show deficient performance on the part of his counsel, he cannot demonstrate that he was deprived of effective assistance of counsel. *See Strickland*, 466 U.S. at 700.[3]

---

[2] Thompson cites to (1) his marital problems, (2) specific instances to impeach Peggy's denials of any wrongdoing by Thompson, (3) hearsay admitted, including (a) Sigournia's testimony that Peggy knew about the abuse by Thompson, (b) the detective's forensic interview of DW, (c) DW's statement to Bethany in 2015 that Thompson had hurt her, (d) DW's comments to Bethany that she saw Thomson at the Outback restaurant, (e) Sigournia's testimony that she thought "he did it" after speaking to Thompson, and (e) Thompson's statement that he was attracted to African-American females, and AT. Thompson also cites to (4) testimony regarding his attraction to African-American females, (5) the State's leading questions to AT and DW, allowing AT and DW to describe the emotional impact of the abuse on them, and permitting the State to use the term "rape" to describe what Thompson did to AT and DW. Br. of Appellant at 29-37.

[3] Even if we knew counsel's reason for not objecting, Thompson would be required to show both that the objection would have been sustained, and that the outcome of the proceeding would have been different had counsel objected. *State v. Crow*, 8 Wn. App. 2d 480, 508, 438 P.3d 541 (2019). Thompson fails to make either of these showings. With regard to the outcome of the proceedings, State presented substantial and overwhelming evidence to support the sex offense convictions. The jury heard testimony from AT and DW that was consistent with their prior disclosures, and heard testimony from Bethany, Sigournia, and Shauna corroborating AT's and DW's testimony and contradicting Peggy's and Thompson's denials of any abuse of AT or DW. Both AT and DW described the abuse they suffered by Thompson in great detail.

No. 52505-4-II

IV. CUMULATIVE ERROR

Thompson argues that these errors amount to cumulative error, warranting reversal of his convictions. This claim fails.

Cumulative error applies when numerous errors deny the defendant his or her right to a fair trial, "even if each error standing alone would be harmless." *State v. Venegas*, 155 Wn. App. 507, 520, 228 P.3d 813 (2010). Absent error, the cumulative error doctrine does not apply. *State v. Clark*, 187 Wn.2d 641, 655, 389 P.3d 462 (2017). Because there was no error, the cumulative error doctrine does not apply.

CONCLUSION

We affirm Thompson's convictions.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

SUTTON, A.C.J.

We concur:

MAXA, J.

CRUSER, J.

11