**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

THE STATE OF WASHINGTON,

Respondent,

v.

ROBERT LORNE HARRISON,

Appellant.

No. 83638-2-I

DIVISION ONE

UNPUBLISHED OPINION

MANN, J. — Robert Harrison was convicted by a jury of two counts of robbery in the first degree and one count of unlawful possession of a firearm in the first degree. Harrison appeals and argues that (1) the trial court erred when it permitted evidence of the showup and in-court identifications, (2) the prosecutor's generic tailoring argument violated his constitutional rights, (3) the prosecutor's misstatement of the evidence in closing argument prejudiced him, (4) the trial court erred when it ruled that he had opened the door to otherwise inadmissible and prejudicial evidence, (5) the trial court erred when it denied his motion for a mistrial, and (6) the cumulative impact of multiple errors denied him a fair trial. We affirm.

I

A

On January 6, 2020, Dinasetia Sangkay and her husband Joseph Moningka decided to have dinner in Seattle's University District.  The couple arrived around 8 p.m., parked Moningka's Honda Accord on a side street, and began walking toward the restaurant.  It was raining and dark at the time, but there were streetlights in the area.  As the two walked down the street, Moningka noticed a man sitting on a bench.  After they passed the man, he approached and called at them from behind.  When Moningka turned to look, the man pointed a handgun at him and demanded his cell phone and car keys.  Moningka shouted "Don't shoot," tried to pull Sangkay behind him to shield her, and surrendered his phone, Sangkay's phone, and car keys.

The man then ran back to Moningka's car while the couple fled in the opposite direction.  Moningka could see the man entering the car from the driver's door.  Moningka borrowed a phone from a nearby pedestrian and called 911.  After moving inside the car for a few minutes, the man exited the vehicle and started running toward the Foege building.[1]  About a minute later, however, Moningka watched the man return to the vehicle.

Responding officers arrived at the scene within about one minute of Moningka's 911 call.  Seattle Police Officer Samantha Morris saw a man later identified as Harrison standing at the front door of Moningka's vehicle.  Because dispatch had not yet described the suspect, Officer Morris did not initially realize the man might be the

---

[1] Foege Hall is a University of Washington property housing the bioengineering department. University of Washington, William H. Foege Bioengineering, https://www.engr.washington.edu/about/bldgs/bioe.

suspect. Once a description of the suspect was provided, Officer Christopher Bentley detained Harrison as he tried to flee the area. Officer Morris identified Harrison as the same person she had seen standing at Moningka's car.

Officers Erik Larson and Benjamin Carter also responded to the 911 call. Moningka described the suspect to Officer Larson as a tall black man wearing a dark hat, blue jacket, and dark pants. When Officer Larson first contacted the victims, he told them, "We have a possible person in custody." Later, Officer Larson told Sangkay, "We caught these people."

Officer Carter left with Moningka to attempt a showup identification of the suspect. While walking to Officer Carter's patrol car, Officer Carter told Moningka that they had someone "detained." During the showup, Moningka positively identified Harrison as the suspect based on his clothing. After receiving information through his ear piece that Moningka had positively identified Harrison, Officer Larson told Sangkay that "This guy's going to jail. He's going to be arrested."

After returning with Moningka, Officer Carter then took Sangkay for a showup identification. After they left, Officer Larson told Moningka, "so it sounds like we found him, right?" Moningka responded, "okay," and Larson followed with, "he's going to go to jail tonight."

Sangkay could not identify Harrison at the showup. Before participating in the showup, however, Sangkay provided a general description of the robber that he was black and wearing a dark hoody and a hat.

When officers searched Harrison, they found an empty pistol holster tied to his waist and both Sangkay's and Moningka's cell phones in his pocket. In Moningka's car,

-3-

officers discovered a loaded .9 mm handgun on the front passenger floorboard under a sunshade along with the car keys.

B

Harrison was charged with two counts of robbery in the first degree (count 1 and 2), each including a firearm sentencing enhancement, and one count of unlawful possession of a firearm in the first degree (count 3).  Harrison denied the charges, arguing that he had been misidentified as the suspect.

Harrison moved during pretrial to suppress Moningka's showup identification because the procedures used were impermissibly suggestive and, under the totality of circumstances, produced an unreliable and inadmissible result.

The trial court found that Moningka's showup identification was impermissibly suggestive by failing to follow police department procedures.[2]  But the court found that under the totality of circumstances, Moningka's identification was sufficiently reliable and determined it admissible.  The trial court determined Sangkay's interactions involving the officers and Moningka was highly improper and suppressed all evidence of Sangkay's involvement in the showup identification.

Harrison also asked that the State be prohibited from asking the victims to identify Harrison in court.  Citing State v. Redmond, 75 Wn.2d 62, 448 P.2d 938 (1968), Harrison argued that without independent evidence supporting an in-court identification the State should be prevented from asking the victims to identify Harrison.  Given that

---

[2] Seattle Police Department policy states, "Administrators will make an effort to avoid saying anything to a victim or witness that would suggest that there is a specific suspect or person of interest for the crime at any time prior to an identification procedure.  During show ups, officers will take reasonable steps to avoid creating the appearance that the suspect is in custody."

Sangkay never identified Harrison, and Moningka only identified him based on clothing, the trial court asked the State how it could possibly make the showing necessary to allow a positive in-court identification. The prosecutor responded:

> Your Honor, I guess the State's point in asking the question in court would just be to show the jury like they do not recognize this person as the person, and it just further goes to their credibility that they are willing to say this and not be persuaded by any kind of outside influences. So that would be the State's only purpose in doing so. So that—I guess to answer the Court's question, do I have any reason to believe that they would say that this is the person? No, I do not.

The trial court ruled, "I'll allow the questions about whether the witnesses are able to identify Mr. Harrison in court, given that I don't expect either one to be able to do so."

Harrison was tried first on the two robbery charges.[3] At trial, Moningka testified that he recognized Harrison as the individual who robbed him. Harrison's counsel tried to impeach the in-court identification, but Moningka said that he could identify Harrison. Sangkay testified that she recognized no one in the courtroom as the robber.

Harrison testified that he was passing through the area on his way to buy drugs from a friend, which he intended to resell at nightclubs. Harrison further testified that he saw a man, purportedly the real robber, sitting in the driver's seat of Moningka's car and then getting out of the car and walking toward the Foege building. After the man left the car and walked away, Harrison decided to steal whatever he could find inside the unattended car. Harrison testified that he found two cell phones and a gun inside a holster.

---

[3] The trial court granted a defense motion to bifurcate the charges for trial, so that count 3 would be considered only after the jury completed deliberations on the robbery charges.

The jury found Harrison guilty on all three charges.[4]

Harrison appeals.

II

Harrison challenged the trial court's decision not to suppress both the showup and in-court identifications.

"In 1977, the United States Supreme Court held that the due process clause of the Fourteenth Amendment compels exclusion of eyewitness identification evidence that (1) was obtained by an unnecessarily suggestive police procedure and (2) lacks reliability under the totality of circumstances." State v. Derri, 199 Wn.2d 658, 673-74, 511 P.3d 1267(2022) (citing Manson v. Brathwaite, 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977); State v. Hilliard, 89 Wn.2d 430, 438-39, 573 P.2d 22 (1977)).

Challenging a police identification procedure requires a two-part analysis. Derri, 199 Wn.2d at 674. First, the defendant must establish by a preponderance of the evidence that the procedure used was unnecessarily suggestive. Derri, 199 Wn.2d at 674. If it was, the court then considers whether, under the totality of the circumstances, the unnecessarily suggestive procedure created a very substantial likelihood of irreparable misidentification. Derri, 199 Wn.2d at 674.

The trial court's findings of fact in a suppression motion are reviewed for "substantial evidence." State v. Garvin, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009). Evidence is "substantial" when it is sufficient "to persuade a fair-minded person of the

---

[4] Guilty verdicts for count 1 and 2 were entered on November, 23, 2021, and guilty verdict for count 3 was entered on November 24, 2021.

truth of the stated premise." Garvin, 166 Wn.2d at 249. Conclusions of law are reviewed de novo. Garvin, 166 Wn.2d at 249.

A

Harrison argues that the trial court erred when it permitted evidence of Moningka's showup identifications because there was a substantial likelihood of irreparable misidentification. We disagree.

Because Officer Carter told Moningka that they had someone detained and they planned to see if Moningka could identify them, the trial court determined that Moningka's showup identification was impermissibly suggestive. We agree with the trial court. Thus, we look to the second part of the Derri analysis—whether the procedure created a very substantial likelihood of irreparable misidentification.

Admission of an identification obtained through a suggestive procedure does not violate due process if it possesses "sufficient aspects of reliability." Derri, 199 Wn.2d at 674. Reliability is assessed using the five Biggers factors: (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the criminal, (4) the level of certainty demonstrated at the procedure, and (5) the time between the crime and the identification procedure. Derri, 199 Wn.2d 658 at 674-75 (citing Neil v. Biggers, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972)). The parties agree that the trial court properly found that Moningka's level of certainty was good and that the showup occurred relatively soon after the robbery. As a result, the only disputed Biggers factors are 1, 2, and 3.

First, the trial court found that Moningka's opportunity to see Harrison was "good." Harrison argues that the trial court's finding is not supported by the evidence because Moningka's opportunity to see Harrison was limited by weather, darkness, hats, hoods, and time. We disagree.

Courts typically consider the duration, distance, and quality of witness' observations in assessing the opportunity of the witness to view the criminal at the time of the crime. Derri, 199 Wn.2d at 686. Although the robbery itself was brief, Moningka continued to observe Harrison for several minutes while he moved inside Moningka's car, went to the Foege building, and came back to the vehicle. Moningka was also close to Harrison during the robbery; Moningka testified that he could have reached out and touched Harrison. And while it was dark, there were streetlights throughout the area and Moningka's identification was based less on fine facial features and more on Harrison's clothing. And finally, Harrison's identification occurred shortly after the robbery when his memory was still fresh. Substantial evidence supports the trial court's finding.

Second, the trial court found Moningka's degree of attention was "good." While Harrison agrees that the "robbery captured Moningka's full attention" he argues that the trial court's finding is not supported because Moningka's attention was divided due to unrelated circumstances, including the presence of a weapon. We disagree.

There is no doubt that Moningka was focused on the weapon pointed at him while the robbery was occurring. But to the extent his attention to Harrison's identity might have been reduced by the stress of being held at gunpoint, Moningka continued to observe Harrison after the robbery as he moved inside the car and came back from

the Foege building.  There is no evidence that Moningka's attention was diminished during his later observations.[5]  Moningka's focus on Harrison both during and after the robbery supports his attention being good.  Substantial evidence supports the trial court's finding.

Third, the trial court found Moningka's description of Harrison was "accurate." Harrison argues that the trial court's finding is not supported by evidence because Moningka's description was not "particularly detailed."  We disagree.  Moningka accurately noted Harrison's race, approximate age, and the clothing he was wearing. Substantial evidence supports the trial court's finding.

Based on the five Biggers factors, Moningka's showup identification of Harrison possessed sufficient "aspects of reliability."  Derri, 199 Wn.2d at 674.  The trial court did not error in denying Harrison's motion to suppress.

B

Harrison next argues that the trial court erred when it permitted Moningka's in-court identification of Harrison because any trial identification was hopelessly tainted by officers' statements following the showup.  We agree that the trial court erred in allowing the in-court identification, but the error was harmless beyond a reasonable doubt.

After Moningka's showup identification, Officer Carter left with Sangkay to determine whether she could make a showup identification, Officer Larson told

---

[5] At trial, Harrison presented Dr. Jeffrey Loftus as an expert on human perception and human memory.  Dr. Loftus testified about "weapon focus," a psychological theory that "if there is a weapon . . . people. . . will tend to pay attention to the weapon" at the expense of other details.  This information was not introduced at the CrR 3.6 hearing, and thus was not part of the trial court's analysis in determining whether to admit the showup identification.  Further, Dr. Loftus did not interview Moningka and did not render a specific opinion in this case.

Moningka, "so it sounds like we found him, right?" Moningka responded, "okay," and Larson followed with, "he's going to go to jail tonight."

After Sangkay rejoined Moningka at the Foege Building following her failure to identify Harrison at the showup, officers returned their cell phones (found on Harrison) and said that they had also recovered their car keys. Officer Larson later explained to both that police were doing everything necessary "in order to get this guy to go away." Officer Larson also said to Sangkay and Moningka, "to summarize everything . . . the guy robbed you, you called 911, we caught him, and he's going to jail." One of the last statements made by Officer Carter to Sangkay and Moningka was, "he will be booked into jail for armed robbery" and, after describing that crime as very serious said, "so he's gonna go to jail."

These statements necessarily confirmed to Moningka that, despite not recognizing his face, he had correctly identified Harrison as the robber. Because Moningka's identification was tainted by the officers' statements after his showup identification, a subsequent in-court identification is inadmissible unless the State can show by clear and convincing evidence that the in-court identification has an independent source uninfluenced by the showup identification and officers' statements. Redmond, 75 Wn.2d at 64-65 (citing United States v. Wade, 388 U.S. 218, 240-42, 87 S. Ct. 1926, 18 L. Ed. 2d 1149 (1967)); Hilliard, 89 Wn.2d at 439-40.

Because the State could not show an independent source for the later in-court identification, it was an error to allow Moningka to be asked whether he could identify Harrison in the jury's presence.

The State bears the burden to overcome a presumption of prejudice and prove the violations harmless beyond a reasonable doubt. State v. Irby, 170 Wn.2d 874, 885-86, 246 P.3d 796 (2011). "'A constitutional error is harmless only if the reviewing court is convinced beyond a reasonable doubt that any reasonable jury would reach the same result absent the error, and where the untainted evidence is so overwhelming it necessarily leads to a finding of guilt.'" State v. Espey, 184 Wn. App. 360, 370, 336 P.3d 1178 (2014) (quoting State v. Burke, 163 Wn.2d 204, 222, 181 P.3d 1 (2008)).

The State meets its burden of proof. The identity of the suspect was the only contested issue at trial. Harrison admitted entering Moningka's car and rummaging around. He also acknowledged being in possession of the victims' phones and a pistol holster. Harrison's defense hinged on his claim that the real robber inexplicably abandoned both his pistol and the proceeds of the crime in Moningka's car, and that Harrison then restole these items when he reentered the open car.

In contrast, during Moningka's 911 call, he told the dispatcher that the robber was "still here . . . trying to. . . take my car." While Moningka briefly lost sight of the robber when he ran toward the Foege building, Moningka saw the same man return to his vehicle about a minute later. As discussed above, the trial court did not err in allowing the video recording of Moningka's showup identification to be introduced at trial. The video was played for the jury and Moningka confirmed while watching the video that "with the help of his clothing, I was able to identify him 100 percent."

In addition, Officer Morris also identified Harrison at trial. Officer Morris explained that when she arrived in response to the 911 call she parked behind the Honda Accord and observed a man standing in the door of the car. The man looked at

her, made eye contact, and gave her a head nod. Officer Morris then testified that once Harrison was apprehended she "immediately recognized him as the same guy who made eye contact with me and head nodded me." Officer Morris continued:

A:    We made very specific eye contact and a head nod when we were at 15th. It was very soon after that that I saw the exact same face with the same clothing description and all of that together, and I was able to recognize that face from just moments prior.

Q:    And is this person in the courtroom today?

A:    He is.

Q:    That you recognized that night?

A:    Yes.

Thus, even excluding Moningka's in-court identification, Harrison was identified by both Moningka's showup identification and by Officer Morris. Any error in allowing Moningka's in-court identification was harmless beyond a reasonable doubt.

III

Under both the United States and Washington Constitutions, a defendant has the right to "appear and defend in person," to testify on their own behalf, and to confront witnesses against them. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22.[6] Harrison argues that the prosecutor committed misconduct during closing argument and violated his constitutional right to appear at trial by improperly suggesting, without evidentiary

---

[6] The Sixth Amendment of the United States Constitution provides in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." The confrontation clause includes the right to be present at trial. Illinois v. Allen, 397 U.S. 337, 338, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (1970). Article I, section 22 of the Washington Constitution provides in pertinent part: "In criminal prosecutions the accused shall have the right to appear and defend in person, or by counsel, to demand the nature and cause of the accusation against him, to have a copy thereof, to testify in his own behalf, to meet the witnesses against him face to face."

support, that he tailored his trial testimony to the evidence. We agree that the prosecutor erred by making a generic tailoring argument in violation of Harrison's constitutional right. But we conclude that the error was harmless beyond a reasonable doubt.

A

A claim of "tailoring" alleges that the defendant conformed their testimony to the evidence they observed while attending trial. State v. Hilton, 164 Wn. App. 81, 93, 261 P.3d 683 (2011). Tailoring arguments are considered "specific" if derived from the defendant's actual testimony, including both direct testimony and cross-examination. State v. Berube, 171 Wn. App. 103, 115-17, 286 P.3d 402 (2012). Tailoring arguments are considered "generic," however, if based solely on the defendant's presence at the proceeding and not based on the defendant's direct examination or cross-examination. Berube, 171 Wn. App. at 115. "A generic tailoring argument raised only in the prosecution's closing argument, and untethered to the defendant's direct testimony or cross-examination, violates article I, section 22 of the Washington Constitution." State v. Carte, ___ Wn. App. 2d. ___ 534 P.3d 378, 386 (2023) (citing State v. Martin, 171 Wn.2d 521, 536-37, 252 P.3d 872 (2011)); Berube, 171 Wn. App. at 116-17).

In Berube, the defendant, Ivory Berube, was charged with first degree assault related to the shooting of Tanisha Barquet outside a Seattle restaurant. 171 Wn. App. at 109. When interviewed by the police, Berube denied knowing or shooting Barquet. At trial, Berube's mother testified that Berube had told her he had drinks with Barquet the night of the shooting. Berube, 171 Wn. App. at 109. Berube also testified at trial that he had drinks with Barquet the night of the shooting but was not involved. Berube,

171 Wn. App. at 110.  In closing argument, the prosecutor made the following comment challenging Berube's credibility:

> And what does he do then when he takes the stand about that conversation, he who has sat here throughout the entire trial and listened to everything that everyone testifies about?  He has to make his version of his events conform with what he has heard his mother testify about.  So he tells you that Kyla and Tanisha had a drink and that he stood there and sipped his vodka drink with them.  If that had happened, Tanisha would have told you that that happened because that would only strengthen her identification of him as the shooter.

Berube, 171 Wn. App. at 114-15.  We concluded that there was no misconduct because the argument was based on Berube's direct testimony and statements to the police and therefore not generic tailoring.  Berube, 171 Wn. App. at 116-17.

In Carte, the defendant, Edward Carte Jr., also testified at trial.  Unlike Berube, there was no evidence presented of conflicting statements or testimony.  During closing argument, the prosecution argued:

> [The defense gave] you the defendant's side of the story, the side of the story that he gave to you after he had the benefit of having heard all of the evidence in this case and hearing how everyone else testified in conforming his testimony to fit for certain facts, but not others.

Carte, 534 P.3d at 386.  We concluded that because the argument was untethered to testimony or evidence it was an improper generic tailoring argument.  We explained:

> The prosecution did not point to any specific portion of Carte's testimony that he conformed "to fit for certain facts."  Nor did the prosecution suggest Carte's testimony differed in any way from statements he made before trial.  Instead, the prosecution asserted Carte "conform[ed] his testimony" to the other evidence based only on the benefit of his right to attend his trial and confront the witnesses against him.  The prosecution's tailoring argument violated article I, section 22 and was improper.

-14-

Carte, 534 P.3d at 386.

B

During Harrison's direct examination, his counsel confirmed with him that he was familiar with the evidence in the case.

Q:     Before I ask you some questions about January 6th, I want to step back and ask some other questions. Have attorney Melesio and I, have we been representing you?

A:     Yes.

Q:     Have you had a chance to review prior to this trial starting some of the police reports, the body cam, the witness interviews and other documents in this case?

A:     I have.

Q:     And you also had a chance to observe and listen to all of the testimony in this trial?

A:     I have.

On cross-examination, the State also briefly touched on Harrison's review of the evidence, without suggesting that his review had impacted Harrison's testimony:

Q:     Now, you heard the testimony in this case. You've been here for this entire trial, correct?

A:     Yes.

Q:     You were present for every single witness who testified in this case?

A:     That's correct.

Q:     You heard the testimony from the officers about the items found on you during the search, is that correct?

A:     That's correct.

During closing argument, however, the prosecutor explicitly accused Harrison of tailoring his testimony based on his knowledge of the evidence against him:

> Now, you also heard testimony from Mr. Harrison himself. And once you get to the jury room and have the instructions in front of you, you will have the opportunity to read this. But on the bottom of page two to the top of page three on instruction one that Judge Roberts read to you, you were instructed that in considering a witness's testimony, you may consider any personal interest in the outcome as well as the reasonableness of the witness's statements in the context of all of the other evidence.
>
> When considering this instruction and weighing the credibility of Mr. Harrison's own statements, you can see that of all the witnesses who took the stand, Mr. Harrison has strong personal interest in the outcome or the issues. Mr. Harrison was present for the entire trial. He had the ability to review the reports and discovery in this case. He has had almost two years, in addition to being able to hear how all of the evidence unfolded in this case, to form his story that he gave to you this morning.

(Emphasis added.) Defense counsel objected, but the objection was overruled.

The prosecutor's argument was generic tailoring. Like Carte, the argument was made only in closing argument and was not tethered to Harrison's direct testimony or cross-examination. The prosecutor did not point to any specific portion of Harrison's testimony that he conformed "to fit for certain facts." Nor did the prosecutor suggest Harrison's testimony differed in any way from statements he made before trial. As in Carte, the prosecutor's argument was generic tailoring and was improper. Carte, 534 P.3d at 386.

C

Because the error was constitutional, we look next to whether the State can demonstrate that the error was harmless beyond a reasonable doubt. Irby, 170 Wn.2d at 885-86. Error of constitutional magnitude is harmless when a reviewing court is

convinced "beyond a reasonable doubt that the State's misconduct did not affect the verdict." State v. Emery, 174 Wn.2d 741, 756, 278 P.3d 653 (2012).

The State meets its burden of proving constitutional harmless error. First, the challenged statement was singular, fleeting, and insignificant in light of the evidence. Second, the statement was made during the State's opening argument and defense counsel directly addressed the implication of tailoring, noting that Harrison had a right to discuss the case with his lawyer and minimizing any potential motive to fabricate. And finally, as discussed above, the evidence of Harrison's guilt was overwhelming. The only issue at trial was his identification, and Harrison was identified by both Moningka's showup identification and by Officer Morris.

IV

Harrison argues that the prosecutor committed misconduct by misstating the evidence during closing argument. While we agree that the prosecutor misstated the evidence, Harrison did not object and the statement was not flagrant or ill intentioned and could have been cured with an instruction. Harrison waived this claim.

A

Harrison testified that while on his way to a friend's house to obtain drugs for personal use and sale, he saw the Honda Accord sitting open and took advantage of the situation to car prowl.

On cross-examination, the prosecutor challenged Harrison's testimony by emphasizing that when police officers searched Harrison, they found no money on him:

Q: You heard the testimony from the officers about the items found on you during the search, is that correct?

A:     That's correct.

Q:     There wasn't any amount of money found on you, is that correct?

A:     No, there wasn't.

Q:     The items that were found on you were the two cellphones, one in each pocket, is that correct?

A:     That's correct.

    . . . .

Q:     Now, in addition to the cellphones that you found in the car, there was also the empty holster that the officers also found on you wrapped around your waist, correct?

A:     That's right.

Q:     But again, no cash on you that you were planning to use in order to resupply your drugs?

A:     Well, I had personal cash on me, in my wallet. That's on my—they have a property report when I got booked into the jail. It was in my wallet along with my credit cards and ID. I had personal cash on me, but nothing I'd found in the car. It was just loose change in the car.

During closing argument, the prosecutor misstated Harrison's testimony, focusing only on Harrison's initial statement that officers found no money on him:

> But in considering Mr. Harrison's testimony and the reasonableness of Mr. Harrison's statements in the context of all of the other evidence that you've been presented with, you will see that his version of events is patently unreasonable. Mr. Harrison testified he was on his way to his friend's house to buy some more drugs. <u>Yet he had no cash on him when he was apprehended by officers</u>.

(Emphasis added.)

Harrison did not object.

-18-

B

If the defendant fails to object to the prosecutor's argument at trial, any error is waived unless the challenged remark was flagrant, ill intentioned, and caused incurable prejudice. State v. Thorgerson, 172 Wn.2d 438, 443, 258 P.3d 43 (2011). "Reviewing courts should focus less on whether the prosecutor's misconduct was flagrant or ill-intentioned and more on whether the resulting prejudice could have been cured." Emery, 174 Wn.2d at 762. Prejudice is incurable when a new trial is the only remedy. Emery, 174 Wn.2d at 762. This court reviews improper remarks in the context of the entire argument, the issues in the case, the evidence addressed in the argument, and the instructions to the jury. State v. Pierce, 169 Wn. App. 553, 552, 280 P.3d 1158 (2012).

Harrison failed to object when the prosecutor misstated the evidence during closing argument and did not address the issue during his own summation. In the context of the entire argument, the prosecutor's misstatement was not flagrant or ill intentioned and was made only once, in passing. Had Harrison objected, the trial court could have stricken the complained-of remark and either instructed the jury to disregard it or reminded them that the attorneys' arguments are not evidence. State v. Dye, 178 Wn.2d 541, 556, 309 P.3d 1192 (2013). Harrison waived his claim of error.

V

In the alternative, Harrison argues that defense counsel was ineffective because (1) defense counsel did nothing when the prosecutor misstated the evidence, (2) a defense objection would have been sustained had defense counsel objected, and (3) the jury verdict would have been different. We disagree.

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantees a criminal defendant the right to effective assistance of counsel. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; State v. Grier, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). To prevail on an ineffective assistance of counsel claim, the defendant must show both that defense counsel's representation was deficient, and that the deficient representation was prejudicial. Grier, 171 Wn.2d at 32-33. Failure to establish either prong is fatal to an ineffective assistance of counsel claim. Strickland v. Washington, 466 U.S. 668, 685-86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). A claim of ineffective assistance of counsel presents a mixed question of law and fact and is reviewed de novo. State v. Sutherby, 165 Wn.2d 870, 883, 204 P.3d. 916 (2009).

An attorney acts deficiently if their conduct falls "'below an objective standard of reasonableness.'" Grier, 171 Wn.2d at 33 (quoting Strickland, 466 U.S. at 688). The defendant must show that any errors made were "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." State v. Fortun-Cebada, 158 Wn. App. 158, 167, 241 P.3d 800 (2010) (quoting Strickland, 466 U.S. at 688). The reasonableness inquiry presumes effective representation and requires the defendant to show the absence of legitimate strategic or tactical reasons for the challenged conduct. State v. McFarland, 127 Wn.2d 322, 335-36, 899 P.2d 1251 (1995). Competency of defense counsel is determined based on the entire record below. McFarland, 127 Wn.2d at 335.

Deciding whether to object is a "classic example[ ] of trial tactics." State v. Crow, 8 Wn. App. 2d 480, 509, 438 P.3d 541 (2019). Furthermore, our Supreme Court had

recognized that "[l]awyers do not commonly object during closing argument 'absent egregious misstatements,'" and thus "[a] decision not to object during summation is within the wide range of permissible legal conduct." In re Pers. Restraint of Davis, 152 Wn.2d 647, 717, 101 P.3d 1 (2004) (quoting United States v. Neocoechea, 986 F.2d 1273, 1281 (9th Cir. 1993)). Here, it is likely that Harrison's counsel chose not to object to the misstatement rather than to highlight to the jury that Harrison's testimony was internally inconsistent.

A defendant is prejudiced by his attorney's deficient performance if he shows a reasonable probability that the outcome of the proceeding would have been different but for his counsel's deficient performance. Grier, 171 Wn.2d at 34. A reasonable probability is defined as "a probability sufficient to undermine confidence in the outcome." Grier, 171 Wn.2d at 34. Here, in light of the evidence of Harrison's guilt, including two identifications, Harrison cannot show a reasonable probability of a different outcome had his counsel objected to the prosecutor's statement.

Harrison fails to carry the high burden of demonstrating ineffective assistance of counsel.

VI

It was uncontested that Moningka and Sangkay had been robbed at gunpoint. In his defense, Harrison claimed that he had not carried a gun since leaving the military and only chanced upon the handgun while prowling Moningka's car. Harrison contends that the trial court erred in allowing the State to impeach Harrison based on his 2016 conviction for robbery. We disagree.

A

ER 404(b) generally prohibits the admission of evidence of other "crimes, wrongs or acts . . . to prove the character of a person in order to show action in conformity therewith." To the extent that the State sought to introduce Harrison's use of a handgun during his 2016 robbery to show that he acted similarly during the robbery of Moningka and Sangkay, the evidence would arguably have been inadmissible under ER 404(b).

But "[a] party may open the door to otherwise inadmissible evidence by introducing evidence that must be rebutted in order to preserve fairness and determine the truth." State v. Wafford, 199 Wn. App. 32, 36-37, 397 P.3d 926 (2017). A party that raises a particular subject at trial may "open the door" to evidence offered to explain, clarify, or contradict the party's evidence. State v. Jones, 144 Wn. App. 284, 298, 183 P.3d 307 (2008). The doctrine is essentially "a theory of expanded relevance" which recognizes "that a party can waive protection from a forbidden topic by broaching the subject." State v. Rushworth, 12 Wn. App. 2d 466, 473, 458 P.3d 1192 (2020).

A trial court's decision to allow cross-examination under an open the door theory is reviewed for abuse of discretion. State v. Ortega, 134 Wn. App. 617, 626, 142 P.3d 175 (2006).

B

During Harrison's direct examination, he confirmed that he had pleaded guilty to robbery in the first degree and possession of stolen vehicle in 2016. Later, as defense counsel had Harrison summarize his testimony, the following exchange occurred between defense counsel and Harrison:

Q:     Did you break into the car yourself?

A:     No, I didn't have to.  It was wide open.  The door was open.

Q:     And is your testimony that you took the cellphones that were in the vehicle?

A:     Yes.

Q:     Did you also have an empty holster on you?

A:     I took that from the car.  When I got arrested, I did have it on me.

Q:     Why did you take the empty holster?

A:     I put the holster on while I was in the car because I was going to put the gun in it.  But once I saw the vehicle behind me, I left the gun there.  I just wanted to get away from the car.  So the holster was still on me at the time.

Q:     <u>Prior to going into this car did you have a firearm on you?</u>

A:     <u>No.  I haven't carried a gun since the military.</u>

 (Emphasis added.)

In response, the State moved to admit evidence that Harrison possessed a gun during the 2016 robbery arrest, which was long after his discharge from the military. Harrison objected, arguing the prior incident was irrelevant and pertained to a collateral matter, noting that the 2016 robbery involved a note to a bank teller and not a firearm. Defense counsel emphasized that, according to the 2016 police report, no firearm was ever found on Harrison.  Instead, a firearm was recovered from the driver's side door of the stolen car, a car Harrison was charged with possessing, but not stealing.

The trial court allowed a narrow inquiry for impeachment purposes:

I will allow impeachment of the statement that was made by Mr. Harrison that he has not carried a firearm since he was in the military.  You may

-23-

utilize information from what you . . . feel you can prove up with regard to the incident.

The following exchange subsequently occurred during the prosecutor's cross-examination of Harrison:

Q:	You stated that you haven't carried a firearm since the military, and this was back in 2006 when you joined the air force?

A:	Yep.

Q:	Now, you stated during direct that you were convicted of robbery in the first degree, as well as possession of stolen vehicle in [2016], correct?

A:	That's correct.

Q:	You pled to real facts in that case, meaning you understood the Court would review the probable cause certification of that case in order to establish a factual basis for your guilty plea, is that correct?

A:	That's correct.

Q:	Now, in that probable cause certification, it indicated that a 9mm handgun was found in the front driver's side door of the vehicle that you were possessing. The vehicle for the purpose of the possession of stolen vehicle charge, is that correct?

A:	That's what the cop said.

Defense counsel asked Harrison several clarifying questions about the prior robbery on re-direct examination:

Q:	In 2016, in this Snohomish County situation that this prosecutor. . . just asked you, was the handgun found in the front driver's side door panel. Is that correct?

A:	That's what I was told.
	. . . .

Q:	Did you actually handle that handgun in 2016 that was in the front driver's side door panel?

A:   No, I didn't.

Q:   Did you use a handgun in the robbery in 2016?  Yes or no?

A:   No.  I went in with a note.

C

At the outset, Harrison's 2016 convictions for robbery and possession of a stolen vehicle involved dishonesty and were per se admissible to attack Harrison's credibility under ER 609(a)(2).  State v. Rivers, 129 Wn.2d 697, 705, 921 P.2d 495 (1996) (robbery); State v. McKinsey, 119 Wn.2d 911, 913, 810 P.2d 907 (1991) (possession of stolen property).[7]  The question, therefore, is whether the underlying facts of the 2016 convictions, including the presence of a handgun, were admissible to explain, clarify, or contradict Harrison's testimony.  Jones, 144 Wn. App. at 298.

Harrison testified that he had not "carried a gun" since leaving the air force.  The implication was he was not the robber because he had never possessed a gun in his post-military life.  But his testimony was misleading because he was in at least constructive possession of a handgun in 2016.  A handgun was found in the driver's side door panel of the stolen car he possessed in 2016.  Harrison opened the door to his post-military possession of guns.  The presence of a handgun during his 2016 crimes contracted or clarified Harrison's testimony.  The trial court did not abuse its discretion in allowing the testimony.

---

[7] The trial court instructed the jury that it could "consider evidence that the defendant has been convicted of a crime only in deciding what weight or credibility to give to the defendant's testimony.  You may not consider it for any other purpose."

VII

Harrison argues that the trial court erred when it denied his motion for a mistrial based on the prosecutor's improper discussion of proof beyond a reasonable doubt during closing argument. We disagree.

A

During their initial closing argument, the prosecutor made these statements:

[Prosecutor]: Now, the State has the burden to prove beyond a reasonable doubt that these crimes were committed by Mr. Harrison. And it is a high burden that the State embraces. But it is not some mythical and unattainable burden of proof. It does not mean beyond all doubt. Because in order for that to happen, you would have needed to be there during this incident to experience every single second of it, to know for sure that it happened.

[Defense]: Objection, misstates burden.

The Court: Sustained.

[Defense]: Moved to strike.

The Court: The last statement is stricken.

[Prosecutor]: It does not mean beyond all doubt. And if you were there to experience every second of this incident to know for sure that it happened, you would be over there—

[Defense]: Objection.

The Court: Sustained.

[Prosecutor]: So what this means is, because it is not beyond all doubt, and because you don't know exactly what happened that day because you were not there—

[Defense]: Objection.

The Court: Sustained.

Harrison moved for a mistrial after the jury was excused. The court then explained why it had sustained Harrison's objections:

> I sustained the objection believing that the basis of the objection was asking the jury to put themselves in the place of the parties or witnesses in the case because of the comments about—sort of three times in a row of you would have to be there. That was what I sustained, not of court, hearing a specific legal basis for the objection, which is not uncommon during the closing, of course. So that's what was going through my mind.

Defense counsel declined to explain the legal rationale for the objections. The court determined that the prosecutor had been understandably confused by its ruling:

> I think the fact that all three of us saw the basis of the objection slightly differently supports [the prosecutor's] assertion that she was not doing anything deliberate and was attempting . . . to determine what was being objected to and move on from it.

The court denied Harrison's motion because defense counsel could not articulate any theory of prejudice warranting a new trial. Defense counsel ultimately requested a curative instruction that was read to the jury before his closing argument:

> At the beginning of [the prosecutor's] closing argument, the Court sustained an objection as to a statement and instructed the jury to disregard that statement. [The prosecutor] went on to twice make related statements that were also objected to. Those objections were also sustained. The Court instructs you to disregard those statements as well.

B

A motion for a mistrial should be granted only when the defendant has been so prejudiced that nothing short of a new trial can ensure that the defendant will be fairly tried. Emery, 174 Wn.2d at 765. A trial court's ruling denying a mistrial is reviewed for an abuse of discretion. State v. McKenzie, 157 Wn.2d 44, 51, 134 P.3d 221 (2006). An abuse of discretion exists only if no reasonable judge could have reached the same conclusion. McKenzie, 157 Wn.2d 44 at 52. In determining whether the trial judge

acted within their discretion, a reviewing court considers (1) the seriousness of the alleged error, (2) whether the error was cumulative to other properly admitted evidence, and (3) whether the trial court instructed the jury to disregard the error. State v. Gamble, 168 Wn.2d 161, 177, 225 P.3d 973 (2010).

Harrison fails to demonstrate prejudice. While perhaps confusing, it appears the prosecutor was simply trying to explain that proof beyond a reasonable doubt was different from zero doubt. Harrison's objections were sustained and the trial court gave a curative instruction. The jury was also instructed that their verdict "must be based solely upon the evidence presented during these proceedings." "Juries are presumed to have followed the court's instructions absent evidence proving the contrary." State v. Kirkman, 159 Wn.2d 918, 928, 155 P.3d 125 (2007). The trial court did not abuse its discretion in denying Harrison's motion for a mistrial.

VIII

Harrison argues that cumulative impact of multiple trial errors denied him a fair trial because in combination, they improperly interfered with presentation of his defense and eased the State's burden to prove his guilt beyond a reasonable doubt. We disagree.

The cumulative error doctrine requires reversal when a defendant establishes that multiple accrued errors rendered a trial fundamentally unfair, even if these errors were individually harmless. In re Pers. Restraint of Cross, 180 Wn.2d 664, 690-91, 327 P.3d 660 (2014), abrogated on other grounds by State v. Gregory, 192 Wn.2d 1, 427 P.3d 621 (2018). The cumulative error "doctrine does not apply where the errors are few and have little or no effect on the trial's outcome." State v. Venegas, 155 Wn. App.

507, 520, 228 P.3d 813 (2010).  "There is no prejudicial error under the cumulative error rule if the evidence is overwhelming against a defendant."  Cross, 180 Wn.2d at 691.  Harrison fails to meet his burden.  As discussed above, the evidence of Harrison's guilt was overwhelming.  The only issue at trial was his identification, and Harrison was identified by both Moningka's showup identification and by Officer Morris.  Harrison's trial was not fundamentally unfair.

Affirmed.

_Mann, J._

WE CONCUR:

_Díaz, J._                              _Coburn, J._